UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

_____
                                          )
In re                                     )
                                          )        Chapter 11
CAMBRIDGE ENDOSCOPIC DEVICES, INC.        )
                                          )        Case No. 15-41706-MSH
                Debtor.                   )
_____   )

**DEBTOR'S MOTION FOR AUTHORITY TO SELL SUBSTANTIALLY
ALL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES,
AND INTERESTS  PURSUANT TO SECTION 363 OF THE
BANKRUPTCY CODE AND COURT-APPROVED SALE PROCEDURES**

Cambridge Endoscopic Devices, Inc. (the "Debtor") hereby moves this Court pursuant to

Section 363 of the Bankruptcy Code, Fed. R. Bankr. P. 6004, and MLBR 6004-1 for authority to

sell substantially all of the Debtor's assets utilized by the Debtor in operating its business,

including without limitation the Debtor's (i) tangible personal property (including machinery and

tooling, manufacturing fixtures, research equipment, inventory, computers and related

equipment, and office equipment and furniture), and (ii) intellectual property consisting chiefly

of patents, patent applications, and trademarks (collectively, the "Assets"), to White Sand Beach

LLC ("WSB"), in its capacity as agent for the Debtor's secured lenders, or to such other entity

that submits the highest or otherwise best offer to acquire the Assets as determined through the

sale process to be authorized by this Court pursuant to the Debtor's related motion for approval

of sale procedures filed concurrently herewith (the "Proposed Sale").  The Proposed Sale is to be

made pursuant to the Asset Purchase Agreement between the Debtor and WSB attached as

Exhibit A (the "APA"), including as it may be modified by agreement between the Debtor and

the successful bidder for the Assets.  By the APA, WSB, which holds a first priority security

interest in the Assets for the benefit of the secured lenders, has agreed to pay $3,100,000 through

a credit bid of $3,000,000 and a $100,000 cash payment to the Debtor.  WSB has paid a non-refundable earnest money deposit of $32,200 that the Debtor has used to secure the services of its counsel to negotiate the APA and to represent the Debtor in this Chapter 11 case, and for payment of certain of the Debtor's patent-related expenses.  The proposed sale of the Assets is to be made free and clear of all liens, claims, and encumbrances except as otherwise provided for by the APA.

In accordance with MLBR 6004-1(c)(1)(A), the Debtor's proposed notice of the Proposed Sale is attached as <u>Exhibit B</u> (the "Sale Notice").  By separate motion filed concurrently herewith, the Debtor is seeking approval of the Sale Notice, and of the sale procedures embodied therein, as the means for soliciting competing bids to acquire the Assets.

Pursuant to MLBR 6004-1(c)(1)(F), the Debtor provides below a practical and abbreviated equivalent of the adequate information required in a disclosure statement for a Chapter 11 plan, including the reasons for pursuing a sale of the Assets through a Section 363 sale rather than a plan of reorganization.

## I.    Summary of Debtor's Business and Financial Affairs

### A.    The Debtor's Business

The Debtor was founded in 2004 by experienced medical device entrepreneurs Woojin Lee and Jack Jacobson with the goal of revolutionizing least invasive surgery through a proprietary platform technology in endoscopic and laparoscopic instrumentation.  Working collaboratively with the surgical community, the Debtor developed a variety of hand-held instruments that enable easy access and unparalleled control for performing endoscopic and laparoscopic surgery in a minimally invasive manner.

While the articulating laparoscopic devices developed by the Debtor were unique and helped surgeons perform more difficult laparoscopic cases more easily, they added cost to each procedure. With the advent of the Affordable Care Act, hospitals became significantly more cost conscious. The Debtor's sales effort required to establish meaningful sales in the face of this economic hurdle was more significant than could be justified by the potential sales. For this reason, the Debtor was not able to secure a profitable distribution relationship with a major company, or to find an acquirer for the Debtor's business.

As a result of these issues, the Debtor generated revenues of only $355,037 and $328,420 during the calendar years 2013 and 2014, respectively, and was unable to generate a profit. During the first eight months of 2015, the Debtor has generated only $70,785 of revenue. The Debtor's declining financial condition and business prospects have caused the Debtor to curtail ongoing business operations and product development. Since September 2014 the Debtor has operated with only two employees, John Schulte and Woojin Lee, neither of whom has taken a salary during that period.

### B.    Prepetition Financing of the Debtor

In addition to equity funding, the Debtor financed its technology and product development and working capital needs through several rounds of unsecured and secured financing. The unsecured financing was provided prior to 2012 in the aggregate principal amount of approximately $2,100,000 (the "Unsecured Loans"). In 2012 and 2013, secured loan advances in the aggregate principal amount of $2,923,000 (the "Secured Loans") were made by the secured lenders identified in the APA (the "Secured Lenders"), for whom WSB (the principal Secured Lender) acts as agent under the governing loan documents. The Secured Loans accrue interest at the rate of 12 percent per annum, with a default interest rate of 15% per annum, and

require payment at maturity of accrued and unpaid interest, plus an amount equal to three times the outstanding principal amount of the Secured Loans. The Secured Loans matured on July 26, 2015, and the aggregate amount of the Secured Lenders' asserted secured claim as of August 31, 2015 is $9,729,845.

The original principal (face) amounts of the notes evidencing the Unsecured Loans totaled approximately $2,100,000. The holders of the promissory notes evidencing the Unsecured Loans have subordinated their claims to the claims held by the Secured Lenders. Incident to this subordination, the unsecured noteholders were issued replacement notes that (like the Secured Loan notes) also require payment at maturity of three time the outstanding principal, and these unsecured subordinate notes have also now matured.

Aside from its obligations to pay the Secured Loans and the Unsecured Loans, the Debtor's liquidated liabilities include approximately $782,000 of contingent employee bonus claims (these claims are contingent on a sale transaction that has yet to occur) and approximately $605,000 of trade payables.

C.     **Events Leading to Chapter 11**

Despite the Debtor's difficulties generating revenue and operating profit, the Debtor's product development efforts created a valuable portfolio of patents and related intellectual property. In an effort to monetize its patent portfolio, the Debtor in July 2013 engaged the services of MedCap Advisors LLC ("MedCap"), an investment banker with expertise in the medical devices industry, to explore a sale of the Debtor as a going concern or other strategic transactions that might unlock the value of the Debtor's technology and intellectual property. This effort did not lead to a transaction, and the Debtor ended its relationship with MedCap in January 2014.

4

Since January 2014, John Schulte and Woojin Lee have continued to work with the Debtor's board of directors to try to sell the Debtor and its assets. Over the past 20 months, the Debtor contacted more than 40 companies that either have a significant presence in the laparoscopic market or another market in which the Debtor's articulating technology might provide a competitive advantage. Despite the Debtor's efforts, the Debtors have been unable to procure an agreement to purchase its assets – possibly as a result of the Debtor's highly leveraged balance sheet combined with its lack of operating revenue.

In light of the substantial obligations to the Secured Lenders (principally WSB) and WSB's security interest in the Debtor's assets, the Debtor conferred with WSB (as agent for all of the Secured Lenders) concerning possible alternatives for finding a purchaser for its intellectual property and other assets. The Debtor and WSB concluded that a sale of the Debtor's assets through a Section 363 sale process presented the greatest potential for maximizing the value of the Debtor's assets, as it would eliminate the Debtor's debt overhang and potentially create a market, in the Bankruptcy Court, where bidders could be solicited successfully. In order to facilitate the Section 363 process, WSB agreed to enter into a "stalking horse" asset purchase agreement, under which WSB would (i) fund the Chapter 11 with a $100,000 cash payment, and (ii) credit bid the balance of the original principal amount of its secured debt (and that of the other Secured Lenders), plus accrued interest. By funding the costs of a Section 363 sale process, WSB hopes that a number of potential bidders emerge paying a greater amount for the Debtor's assets than WSB's stalking horse bid. To that end, the Debtor and WSB have negotiated the APA and the Debtor has filed this Chapter 11 case to pursue the sale of the Debtor's assets. Should a sale to a higher and better cash bidder occur, WSB has

agreed to share that upside with the Debtor's creditors as described more fully below in Section

III.

## II.    <u>Reason for a Section 363 Sale</u>

Having effectively ceased business operations and having no funds with which to

continue its efforts to sell the Assets or to fund a plan of reorganization, the Debtor has no

prospect of utilizing Chapter 11 to reorganize.  The Debtor's wind-down alternatives included

filing for Chapter 7 or allowing the Secured Lenders to foreclose their security interest in the

Assets outside of bankruptcy.  After consultation with the WSB as agent for the Secured

Lenders, the Debtor and WSB have agreed to conduct a Section 363 sale process, in connection

with which the Secured Lenders have agreed to fund $100,000 to pay the reasonably expected

costs to the Debtor of effecting a bankruptcy sale; in addition, WSB and the Debtor agreed that

the sale would be structured to provide some "upside" to the bankruptcy estate if the results of

the sale process generated a better bid for the Assets from a third party.  Under the APA, the

Secured Lenders have agreed to a carveout of $100,000 (of which $32,200 is a prepetition

deposit used by the Debtor to pay for legal services related to negotiation and documentation of

the sale agreement and commencement of this Chapter 11 case, and for certain patent related

expenses), with potential sharing by the bankruptcy estate if sale proceeds exceed WSB's

stalking-horse bid of $3,100,000, as detailed below in Section III.

Any feasible alternative to the Proposed Sale—such as a Chapter 7, secured party sale, or

assignment for the benefit of creditors (with the Secured Lenders' consent)—would of necessity

involve the sale of the Assets, whether by the relevant creditor fiduciary or by the Secured

Lenders themselves.  But such sale alternatives would almost certainly leave nothing for the

Debtor's other creditors.  The Debtor and its principal creditors—the Secured Lenders—have

determined that, presently, the best means to market the Debtor's assets is through a Section 363

sale. Because such an alternative has a greater potential for attracting other bidders, the Debtor

believes it is a better alternative for all of its creditors, who will share in any proceeds of a cash

sale to a third-party bidder (as described below in Section III). Further, by agreeing to the

minimum $100,000 carveout, the Secured Lenders have paid for the Debtor's pursuit of a

Section 363 sale as the means to maximize the value of the Secured Lenders' security interest in

the Assets. Accordingly, the Debtor believes that the Proposed Sale, by providing for the

minimum $100,000 carveout (with potential upside) to the Debtor, presents the best sale

alternative from the Debtor's perspective as well, and that accordingly the Proposed Sale is in the

best interests of all creditors.

III.    **Summary of the Proposed Sale**

By this motion, the Debtor seeks authority to sell the Assets to WSB pursuant to the APA

(or to a competing bidder that submits the highest or otherwise best offer to acquire the Assets),

as determined through the sale process to be authorized by this Court pursuant to the Debtor's

related motion for approval of sale procedures filed concurrently herewith. The principal terms

and conditions of the APA and the Proposed Sale, and the manner in which the Debtor intends to

solicit competing bids, are summarized below:

- **Assets Being Sold**

The specific Assets to be sold are identified in Section 2.01 of the APA, and constitute
substantially all of the Debtor's tangible and intangible personal property, including all of the
Debtor's intellectual property, used in the development and commercialization of the Debtor's
proprietary technology and products, aside from the Debtor's cash on hand, accounts receivable,
and other assets identified as "Excluded Assets" under the APA and briefly described below.
Because the principal Assets are patents and related intellectual property utilized in the Debtor's
proprietary technology and products, because the Debtor believes that the highest and best value
for the Assets will be obtained through a sale of all of the Assets together, and because WSB's
stalking horse bid is to acquire all of the Assets, the Debtor anticipates that prospective bidders
will be interested in acquiring all of the Assets and the Debtor is proposing to sell all of the

Assets together.  Nevertheless, any prospective purchaser may elect to acquire less than all of the Assets by so specifying in its offer.  In the event there are competing offers for different subsets of the Assets, then the Debtor, in consultation with any creditors' committee (if one is appointed), and subject to discussion with WSB, will determine which offer, or group of offers, represents in the aggregate the highest or otherwise best offer for the Assets.

- **Purchase Price Consideration**

WSB's stalking horse bid to acquire the Assets is for $3,100,000, of which $3,000,000 is a credit bid by WSB of the Secured Lenders' secured claim and $100,000 will be paid in cash, inclusive of WSB's nonrefundable earnest money deposit of $32,200.  Any competing bids to acquire the Assets must be made in compliance with the sale procedures to be established by the Bankruptcy Court; the Debtor has proposed, consistent with the APA, that any competing bid must be a cash bid in an amount of not less than $3,150,000.

- **Potential Assumption of Certain Liabilities**

The APA provides that WSB shall not assume any of the Debtor's liabilities except as expressly provided by the APA, and currently it is anticipated that WSB shall not assume any such liabilities.  Prospective purchasers may elect to assume certain of the Debtor's liabilities that might appropriately be assumed by an acquirer intending to continue one or more of the Debtor's product lines, such as, by way of example, the Debtor's obligations relating to prepetition use or maintenance of specific assets. The Debtor (in consultation with any creditors' committee) may elect to take offers to assume liabilities into account in determining the highest or otherwise best offer to be obtained by the Debtor and its bankruptcy estate through the sale process; however, consistent with the APA requirement that any competing purchase offer must include a cash bid of at least $3,150,000, the Debtor will not entertain offers to assume liabilities to the Secured Lenders unless the Secured Lenders agree to such treatment.

- **Excluded Assets**

While the Proposed Sale will involve substantially all of the Debtor's assets, certain assets will be excluded from the sale.  Excluded assets are set forth in detail in Section 2.02 of the APA, and notably include the Debtor's cash and accounts receivable and the Debtor's rights, claims and causes of action under Chapter 5 of the Bankruptcy Code (e.g., its right to seek avoidance and recovery of preferential and fraudulent transfers for the benefit of creditors). Excluded assets also include the Debtor's few executory contracts.  (In the unanticipated event that a prospective competing bidder is interested in obtaining assignment of one or more of these contracts, then the Debtor would consider seeking authority to assume and assign such contract(s), otherwise, the Debtor expects to seek to reject these contracts.)

- **Sale Free and Clear**

The proposed sale of the Assets will, pursuant to Section 363(f) of the Bankruptcy Code, be free and clear of all liens, claims, and encumbrances, including without limitation all consensual liens and security interests and all liens or claims arising by operation of law and all

claims based on "successor liability" theories of recovery. Any and all such liens, claims, and encumbrances shall attach with equal effect and priority to the proceeds of sale. The Proposed Sale may be effected free and clear of all liens, claims, encumbrances, and interests because WSB, the sole holder of a lien against the Assets, consents to the sale. 11 U.S.C. § 363(f)(2).

- **Disposition of Sale Proceeds Upon Sale to Alternate Bidder**

Pursuant to Section 2.09 of the APA, in the event that the Assets are sold to a purchaser other than WSB, then upon the closing under the alternate purchaser's purchase agreement, (i) the Debtor shall first receive $100,000 of the cash consideration paid by the alternate purchaser (the "First Tier Consideration"); (ii) WSB shall next receive the additional consideration paid by the alternate buyer up to $3,100,000 (the "Second Tier Consideration"); (iii) WSB shall receive ninety percent (90%) of the consideration paid by the alternate buyer in excess of $3,100,000, up to $4,000,000 (the "Third Tier Consideration") and the Debtor shall receive ten percent (10%) of the Third Tier Consideration; (iv) WSB shall receive seventy five percent (75%) of the consideration paid by the alternate buyer in excess of $4,000,000, up to $5,000,000 (the "Fourth Tier Consideration"), and the Debtor shall receive twenty five percent (25%) of the Fourth Tier Consideration; and (v) WSB shall receive seventy percent (70%) of the consideration paid by the alternate buyer in excess of $5,000,000 (the "Fifth Tier Consideration"), and the Debtor shall receive thirty percent (30%) of the Fifth Tier Consideration up to the payment in full of the Secured Claim at which point the Debtor shall receive 100% of any additional consideration.

- **Treatment of the Secured Lenders' Claims**

Pursuant to Section 2.05(ii) of the APA, the Debtor has agreed that the Secured Lenders' aggregate secured claim shall be allowed, for purposes of credit bidding pursuant to Section 363(k) of the Bankruptcy Code, in an amount up to $9,729,845. Pursuant to Section 2.09 of the APA, upon the closing of a sale where WSB has made the successful bid and paid the purchase price, any remaining balance of the Secured Lenders' claims against the Debtor and its bankruptcy estate shall be deemed waived provided that the Debtor executes a general release in favor of the Secured Lenders of any and all claims the Debtor may have against the Secured Lenders.

- **Conditions to Closing**

The closing of the Proposed Sale is subject to customary conditions for a Section 363 sale, as set forth in Article 8 of the APA, notably including the entry of the Bankruptcy Court's order authorizing the sale and the lack of any pending or threatened proceeding challenging the Proposed Sale.

- **Miscellaneous Provisions**

The APA contains other terms and conditions customary for a commercial sale transaction subject to Bankruptcy Court approval, and should be reviewed for details of such terms and conditions. The APA requires, and the Proposed Sale contemplates, that prospective bidders will abide by confidentiality restrictions with respect to the Debtor's confidential

information, and that WSB (and each other prospective bidder) will bear its own expenses associated with negotiation, documentation, and efforts to obtain Bankruptcy Court approval of its offer and related definitive purchase agreement.  The proposed sale procedures also contemplate other terms and conditions customary to an asset sale of the nature involved.

- **Sale Hearing; Competing Bids**

The proposed sale procedures contemplate that "Qualified Bids" to purchase Assets must be submitted to the Debtor by the bid deadline established by the Bankruptcy Court (the Debtor has requested a bid deadline of no later than November 12, 2015).  WSB's stalking horse bid embodied in the APA is deemed to constitute a "Qualified Bid".  If more than one Qualified Bid is submitted, the Debtor, in accordance with the proposed sale procedures, will conduct an auction among Qualified Bidders at which each Qualified Bidder will be entitled to participate, in accordance with such procedures as may be determined by the Debtor (in consultation with any creditors' committee) or the Bankruptcy Court.

- **Solicitation of Competing Bids**

As noted above, the Debtor has spent over two years (since July 2013) actively seeking a buyer of its technology and intellectual property.  In that process, the Debtor has compiled a list of more than 40 parties that might be interested in making a bid for the Assets.  Given the Debtor's lack of financial resources and the size of this potential transaction, the Debtor is not convinced that it would make sense to spend money for an investment banker.  However, the Debtor's experience seeking offers puts it in a good position to solicit the interest of potential bidders for the Assets.  The Debtor intends to provide notice of the Proposed Sale to all of the more than 40 entities that the Debtor previously contacted, and to make its employees available to respond to any due diligence requests made by prospective acquirers (subject to appropriate confidentiality restrictions), all as more specifically set forth in the sale procedures motion filed herewith.  The Debtor believes that marketing the Assets and soliciting competing bids in this manner is the best approach under the circumstances.

IV.    **Summary of Debtor's Assets and Liabilities**

The following is a summary of the Debtor's assets and liabilities:

A.    **Debtor's Assets**

The Debtor's most valuable assets are its patents and related intellectual property.

Current assets include cash and accounts receivable of approximately $5,000 as of August 31,

2015.  Fixed assets include machinery and tooling, manufacturing fixtures, research equipment,

inventory, computers and related equipment, and office equipment and furniture having a book

value of approximately $10,000.

**B.    Other Potential Assets of the Estate**

The Proposed Sale does not affect the Debtor's rights to assert claims, such as actions to avoid preferential or fraudulent transfers.  Potential avoidance actions arising under Sections 544 through 553 of the Bankruptcy Code are not subject to WSB's security interest or to any other lien.  Typically, principal avoidance actions would include avoidance of preferential transfers and avoidance of fraudulent transfers.

**1.    Preferential Transfers**

The Bankruptcy Code permits a debtor's bankruptcy estate to avoid and recover certain transfers of an interest in the debtor in property, if the transfers were made within 90 days before the bankruptcy filing or, in the case of a transfer to an insider of the debtor, within one year before the bankruptcy filing.  In general terms, such a transfer can be recovered if it was made by an insolvent debtor, to or for the benefit of a creditor, on account of an antecedent debt, and the transfer allowed the creditor to receive more than it would have under a Chapter 7 liquidation. However, the Bankruptcy Code also provides various defenses to recipients of such transfers. An otherwise preferential transfer is excepted from recovery if, for example, the transfer was made in the ordinary course of business, or the creditor receiving the transfer provided the debtor with new value (such as additional products or services) after the transfer.

While the Debtor has not yet conducted a formal analysis of potential available preferences, the Debtor believes it unlikely that there are any colorable preference claims, principally due to the dearth of payments to creditors within the 90 day (or one year for insiders) preference period, as reflected by the Debtor's disclosures in its Statement of Financial Affairs filed with the Bankruptcy Court.  In the unlikely event that there are preference recoveries, the proceeds would be available for payment of priority claims (including the expenses of

administration of this Chapter 11 case), and, thereafter, for distribution to general unsecured creditors.

### 2.      Fraudulent Transfers

The Bankruptcy Code and state law also permit a debtor to recover fraudulent transfers. There are two categories of transfers which could be fraudulent: first, transfers made for less than reasonably equivalent value while the debtor was in financial distress; and second, transfers made by the debtor with actual intent to hinder, delay or defraud its creditors.  The Debtor does not believe that it has made any fraudulent transfers.

### C.      Debtor's Liabilities

### 1.      Secured Claims

A claim is "secured"" when a creditor holds a lien on particular assets ("collateral") to assure payment of the claim.  In general, proceeds from any sale of collateral must be applied first to the repayment of any claims secured by the collateral.  If the amount of the claim exceeds the value of the collateral, then the claim is considered to be a "secured claim" under the Bankruptcy Code only to the extent of value of the collateral.  The Bankruptcy Code permits the holder of a secured claim to require that the claim be paid in full, although payment may be made over a period of time if the secured creditor keeps its lien or receives equivalent assurance of payment.

Secured claims against the Debtor include the claims of the Secured Lenders on account of the Secured Loans.  As noted, the Secured Lenders assert aggregate claims in the amount of $9,729,845.  The Proposed Sale contemplates that WSB, as agent for the Secured Lenders, will be permitted to credit bid up to the full amount of the Secured Lenders' claims to acquire the Assets.  If WSB is the winning bidder, then upon the closing of the sale under the APA, the

Secured Lenders will be deemed to waive any remaining portion of their claims not applied to the purchase price through their credit bid.  If an alternate bidder submits the winning bid, then the Secured Lenders will be entitled to the proceeds of sale up to the amount of their secured claim, subject to the Debtor's right to share in sale proceeds as set forth in Section 2.09 of the APA and described in Section III above.

### 2.       Priority Claims

The Bankruptcy Code entitles certain types of unsecured claims to be paid in full prior to other claims.  These "priority claims" include expenses incurred during the Chapter 11 case (including fees of professional persons), wages incurred within 90 days and employee benefits incurred within 180 days before the beginning of the Chapter 11 case (up to $12,475 per employee), and most taxes arising before the Chapter 11 case. The Debtor believes that it has paid all prepetition taxes and employee compensation entitled to priority, and that there are no prepetition priority claims.

Postpetition liabilities entitled to priority as administrative expenses will include professional fees of Chapter 11 professionals (*i.e.*, the Debtor's attorneys, and any counsel hired by a creditors' committee if one is appointed) and other costs of administering the Debtor's estate.  Ordinary course business expenses such as patent maintenance fees may be paid from ongoing business revenues (*i.e.*, proceeds of accounts receivable, subject to the Secured Lenders' consent to use of their cash collateral), or from proceeds of the sale of the Assets that are paid to the Debtor.

### 3.       General Unsecured Claims

Unsecured claims not entitled to priority under the Bankruptcy Code are called "general unsecured claims."  If a claimant loaned money or supplied goods or services to the Debtor prior

to September 1, 2015 (when the Debtor's Chapter 11 case was filed) and has not been paid, then

that claimant probably holds a general unsecured claim against the Debtor.  General unsecured

liabilities as scheduled by the Debtor in its schedules filed with the Bankruptcy Court include the

Unsecured Loans in the aggregate principal amount of approximately $2,100,000 (prior to giving

effect to the "three times principal" payment provision of the Unsecured Loan notes), contingent

employee bonus claims totaling approximately $782,000, and prepetition trade payables totaling

approximately $605,000.  In addition, the Debtor anticipates that approximately $530,000 of

contract rejection damage claims will be asserted by non-Debtor parties to three executory

contracts that are not included in the Proposed Sale.

## V.   **Potential Distributions to Creditors**

The Debtor currently anticipates that, absent a higher cash bid from a bidder other than

WSB, the Debtor will receive $67,800 of sale proceeds (the $100,000 cash component less the

$32,200 deposit already paid) that will be available to pay the Debtor's Chapter 11

administrative expenses.[1]  If such expenses total less than $67,800, then remaining available

funds would be available to pay prepetition priority claims (if any) and general unsecured claims.

If the Assets are sold to an alternate bidder for more than $3,100,000 of cash, then there would

be incrementally more sale proceeds paid to the Debtor and available for distributions. In the

absence of competing offers for the Debtor's assets, the Debtor expects that there will be little if

any funds available for distribution to general unsecured creditors.  Hypothetically, additional

funds might be generated from pursuit of avoidance actions such as the recovery of preferential

---

[1] The Debtor used $25,000 of the $32,200 deposit to fund (together with a prior $2,500 payment) to fund a $27,500 retainer to the Debtor's undersigned bankruptcy counsel and to pay approximately $7,200 of patent maintenance fees.  Undersigned counsel's prepetition fees and reimbursable expenses totaled $36,294.  Counsel has applied its $27,500 retainer in full satisfaction of its invoices for such prepetition fees and expenses, and has waived its right to payment of the unpaid portion of such prepetition invoices.

or fraudulent transfers, and other causes of action of the estate, but, as described in Section IV.B above, the Debtor does not believe that there are any colorable claims to be pursued by the Debtor.

If a sale of the Assets to a competing cash bidder is approved, then there should be additional cash sale proceeds paid to the Debtor (as compared to the cash proceeds from a WSB purchase funded principally through its credit bid), as detailed in Section III above.  Any increased cash payment to the Debtor would enhance the potential for a possible distribution to unsecured creditors.

## VI.    Claims Objections

No claim will be paid unless it is allowed by the Bankruptcy Court.  If a claimant files a proof of claim before the deadline to be established by the Court, then the claim will be automatically allowed unless the Debtor or another interested party files a written objection with the Bankruptcy Court.  Even if a claimant does not file a proof of claim, any liability of the Debtor that the Debtor has listed in the Schedules of Liabilities filed with the Bankruptcy Court, and has not listed therein as disputed, unliquidated or contingent, will be automatically allowed unless an objection to allowance is filed with the Bankruptcy Court.

If an objection to a claim is filed, a copy of the objection will be sent to the claimant, who will also receive a notice specifying the deadline to file a written response to the objection, as well as the date, time and place of the hearing regarding the merits of the claim.

## VII.   The Bankruptcy Process for Approval of the Proposed Sale

### A.    Objections

If a party in interest, such as a creditor, does not believe that the Proposed Sale is reasonable or in the best interest of the Debtor and its creditors, it can object to this motion by

filing a written objection setting forth the basis for the objection. The deadline for submitting an objection will be set by the Court as will the date of the hearing on this motion, at which objecting parties may be heard. Notice of the objection deadline and hearing will be provided to the Debtor's creditors. The Debtor believes that the Proposed Sale is in the best interest of creditors, particularly since the Proposed Sale contemplates a sale to the bidder submitting the best offer, and the sale procedures governing the Proposed Sale are intended to elicit the highest or otherwise best offer to purchase the Assets.

**B.      Offers to Acquire the Assets**

Any party interested in submitting an offer to purchase the Assets (or any portion thereof) should contact the undersigned Debtor's counsel at the earliest possible date, and comply with the deadline and governing procedures for submission of offers to be established by the Bankruptcy Court.

**C.      Sale Order**

The Debtor intends that Bankruptcy Court approval of the Proposed Sale will be effected through entry of a sale order (i) authorizing the Debtor's sale of the Assets free and clear of liens, claims, encumbrances, and interests, with any and all such liens, claims, encumbrances, and interests to attach to sale proceeds, (ii) approving the Asset Purchase Agreement governing the Proposed Sale, and (iii) containing such additional provisions and protections of the estate and the purchaser as are typical for an all-asset sale pursuant to Section 363 of the Bankruptcy Code. The Debtor intends to file a proposed form of sale order once the winning bidder is identified and after consultation with WSB and any winning bidder other than WSB.

**D.      Good Faith Purchaser**

By this Motion, the Debtor is requesting that the Court make a finding in its order approving the Proposed Sale that WSB (on behalf of itself and the other Secured Lenders) is a good faith purchaser for purposes Section 363(m) of the Bankruptcy Code.  Under Section 363(m),

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of [Section 363] of  a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. §363(m).  Because the APA was the result of arm's length negotiations, and because there has been no fraud, collusion or other comparable behavior to demonstrate a lack of good faith, the Debtor believes that it a good faith finding would be appropriate under these circumstances.  In addition, the Debtor will monitor the conduct of WSB throughout the sale process, to ensure compliance with Section 363(n) of the Bankruptcy Code.  Accordingly, the Debtor requests that the Court make a finding at the hearing to approve the Proposed Sale that the APA was negotiated at arm's length and is entitled to the full protections of Section 363(m) of the Bankruptcy Code.

**E.    Waiver of Stay under Bankruptcy Rules 6004(h) and 6006(d)**

In order to maximize the value received for the Assets, the Debtor seeks to close the sale of the Assets as soon as possible after the hearing to approve the Proposed Sale. Accordingly, the Debtor requests that the Court waive the 14-day prior under Bankruptcy Rule 6004(h) and, to the extent applicable (if an alternative buyer seeks to have one or more executory contracts assigned to it), Bankruptcy Rule 6006(d).

## VIII.    <u>Notice of Sale Motion</u>

In accordance with MLBR 6004-1(b), the Debtor through its undersigned counsel is

serving a copy of this Motion upon the Debtor, the United States Trustee, the Secured Lenders

(through their agent, WSB and its counsel), and the Debtor's 20 largest unsecured creditors as set

forth in the list filed by the Debtor pursuant to Fed. R. Bankr. P. 1007(d).  A certificate of service

is attached.

<u>Conclusion</u>

WHEREFORE, the Debtor respectfully requests that this Court:

(a) Grant this Motion and authorize the Proposed Sale;

(b) Enter a finding that WSB (as agent for itself and the other Secured Lenders), or any

alternative buyer submitting a higher and better offer for the Assets that is approved by this

Court) is entitled to the protections of Section 363(m) of the Bankruptcy Code;

(c) Waiver the 14-day stay set forth in Bankruptcy Rule 6004(h) and, to the extent

applicable, Bankruptcy Rule 6006(d); and

(d) Grant such other and further relief as this Court may deem just and proper.

Dated: September 4, 2015

CAMBRIDGE ENDOSCOPIC DEVICES, INC.

By its proposed counsel,

/s/ A. Davis Whitesell
Michael J. Goldberg (BBO #551869)
A. Davis Whitesell (BBO #551462)
Casner & Edwards, LLP
303 Congress Street
Boston, MA  02210
Tel: 617-426-5900
Fax: 617-426-8810
Email: whitesell@casneredwards.com

## Exhibit A

**[Asset Purchase Agreement]**

**[filed separately]**

**<u>Exhibit B</u>**


**[Sale Notice]**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

| | | |
|---|---|---|
| _____ | ) | |
| In re | ) | |
| | ) | Chapter 11 |
| CAMBRIDGE ENDOSCOPIC DEVICES, INC. | ) | |
| | ) | Case No. 15-41706-MSH |
| Debtor. | ) | |
| _____ | ) | |

**NOTICE OF (A) INTENDED SALE OF SUBSTANTIALLY ALL ASSETS
FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES,
AND INTERESTS; (B) DEADLINES AND PROCEDURES FOR
SUBMITTING OFFERS AND OBJECTIONS; AND (C) HEARING DATE**

To Creditors and Parties in Interest:

   **PLEASE TAKE NOTICE THAT**, pursuant to Section 363 of the Bankruptcy Code, Fed. R. Bankr. P. 2002 and 6004, and MLBR 6004-1, and the Debtor's Motion For Authority to Sell Substantially All Assets Free and Clear of Liens, Claim, Encumbrances, and Interests Pursuant to Section 363 of the Bankruptcy Code and Court-Approved Sale Procedures dated September __, 2015 [Docket No. __] (the "Sale Motion"), Cambridge Endoscopic Devices, Inc. (the "Debtor"), proposes to sell substantially all of the Debtor's assets, including without limitation the Debtor's (i) tangible personal property (including machinery and tooling, manufacturing fixtures, research equipment, inventory, computers and related equipment, and office equipment and furniture), and (ii) intellectual property consisting chiefly of patents, patent applications, and trademarks (collectively, the "Assets"), to White Sand Beach LLC ("WSB"), in its capacity as agent for the Debtor's secured lenders, or to such other entity that submits the highest or otherwise best offer to acquire the Assets (the "Proposed Sale").

   The Proposed Sale is to be made pursuant to the Asset Purchase Agreement between the Debtor and WSB (the "APA") attached as <u>Exhibit A</u> to the Sale Motion, and pursuant to the procedures set forth below in this Notice.  A more detailed description of the Assets, and of the terms and conditions of the Proposed Sale, is set forth in the APA.  WSB is the Debtor's principal secured lender, and, as set forth in the APA, WSB as agent for all of the Debtor's secured lenders (the "Secured Lenders") shall pay $3,000,000 of the $3,100,000 purchase price through application of the Secured Lenders' aggregate claim against the Debtor in the asserted amount of $9,729,845.  WSB has an address at:  c/o Robinson Brog Leinwand Greene Genovese & Gluck P.C., 875 Third Avenue, New York, NY 10022, Attn:  Adam J. Greene.

   **PLEASE TAKE FURTHER NOTICE THAT**, pursuant to Section 363(f) of the Bankruptcy Code, the Assets will be sold free and clear of liens, claims, encumbrances, and interests (except for certain Permitted Encumbrances, if any, as may be set forth in the APA for the winning bid), whether consensual or arising by operation of law, with all such liens, claims, encumbrances, and interests to attach with equal effect and priority to the proceeds of sale.  The

Assets are subject to a first priority security interest held by WSB as agent for the Secured Lenders.

**ANY OBJECTIONS TO THE SALE MOTION** must be stated in writing and must state with particularity the grounds for the objection and why the sale of the Assets should not be authorized and **must be filed with the Office of the Clerk of the Court by no later than 4:30 p.m. (prevailing Eastern Time) on October ____, 2015 (the "Objection Deadline")**, and a copy served upon each of the following persons so as to be received by such Objection Deadline:

(a)     attorneys for the Debtor, Casner & Edwards, LLP, 303 Congress Street, Boston, MA 02210, Attn: Michael J. Goldberg, Esq., email: goldberg@casneredwards.com;

(b)     attorneys for WSB, Robinson Brog Leinwand Greene Genovese & Gluck P.C., 875 Third Avenue, New York, NY 10022, Attn: Adam J. Greene, Esq.; and

(c)     the United States Trustee, Attn: _____, Esq., United States Department of Justice, Office of the United States Trustee, 446 Main Street, 14th Floor, Worcester, MA 01608, Fax (617)___-____, email _____@usdoj.gov.

Objections to the Sale Motion will be governed by Fed. R. Bankr. P. 9014.

**PLEASE TAKE FURTHER NOTICE THAT** a hearing (the "Sale Hearing") will be held before the Honorable Melvin S. Hoffman, at the United States Bankruptcy Court for the District of Massachusetts, Courtroom No. ___, Donohue Federal Building, 595 Main Street, Worcester, MA 01608, **on October ___, 2015 at _____ __.m. (prevailing Eastern Time)**, to consider approval of the Sale Motion and the sale of the Assets to WSB or other successful bidder as determined by the Debtor and approved by the Court.  The Court may modify the method of sale set forth in this Notice at or prior to the Sale Hearing.  The Court may take evidence at the Sale Hearing (or any hearing on approval of the Proposed Sale) to resolve issues of fact.  If no objection to the Sale Motion or the Proposed Sale is filed, and no competing Qualified Bid submitted, then the Court may approve the Sale Motion and the Proposed Sale without requiring a hearing.

**PLEASE TAKE FURTHER NOTICE THAT**, if you are interested in submitting a bid to purchase the Assets or any substantial portion thereof, please contact the Debtor, Attention: John Schulte, Phone (617) ___-____, email: schultejohn@yahoo.com, in order to obtain additional information about the Assets and to arrange for execution and delivery to the Debtor of a confidentiality agreement pursuant to which such additional information will be provided. **Competing offers to purchase the Assets must comply with the procedures set forth immediately below concerning "Qualified Bids" to be considered for acceptance by the Debtor and approval by the Bankruptcy Court, and must be submitted by no later than November ___, 2015 at __:__ __.m. (prevailing Eastern Time) (the "Bid Deadline")**.

**PLEASE TAKE FURTHER NOTICE THAT**, in order for any competing purchase offer to constitute a "Qualified Bid", the competing offeror must file with the Bankruptcy Court and serve on undersigned counsel to the Debtor, **by no later than the Bid Deadline**, the following documents, deposit, and information (the "Required Bid Documents"):

- A legally-binding offer to purchase the Assets (or portion thereof) pursuant to a proposed asset purchase agreement (an "Asset Purchase Agreement") that is in the form of the APA, marked with any proposed changes from the APA (which changes shall be deemed to include, as to the competing offeror, deletion of any APA provisions governing WSB's right to credit bid or to receive sale proceeds), and providing for such offeror's purchase of the Assets on an "as is, where is" basis, for a cash purchase price of not less than $3,150,000, and not subject to any contingencies other than entry of an order of the Bankruptcy Court authorizing the Debtor's sale of the Assets free and clear of liens, claims, encumbrances, and interests in form and substance customary for Section 363 asset sales of similar nature. The offer embodied in a bidder's Asset Purchase Agreement must (i) not be subject to or conditioned upon any financing contingencies, or on the outcome of due diligence, except as otherwise permitted by the Debtor in consultation with WSB (and any creditors' committee), (ii) be binding on each entity or partner participating in the bid, (iii) not request or entitle the bidder to any breakup fee, termination fee, expense reimbursement or similar type of payment, and (iv) provide for the closing of such transaction within the same period as provided by the APA, except as may otherwise be agreed to by the Debtor in consultation with WSB (and any creditors' committee).

- A certified check or wire transfer representing a good faith deposit (the "Deposit"), in the amount of not less than $50,000, payable to the order of Casner & Edwards, LLP, as attorneys for the Debtor, and delivered to that firm at 303 Congress Street, Boston, Massachusetts, Attn: Michael J. Goldberg.

- Written evidence of a commitment for financing sufficient to consummate, or other evidence satisfactory to the Debtor of the bidder's ability to consummate, its proposed purchase of the Assets.

- Full disclosure of the identity of each entity that will be participating in such bid, including any proposed designee(s), and sufficient financial and other information regarding the bidder and all other parties participating in the bid to satisfy the Debtor with respect to the requirements enumerated in Section 363(m) of the Bankruptcy Code.

- Written evidence that the bidder has obtained authorization and approval from its Board of Directors (or comparable governing body) with respect

to the submission of its offer, or a representation that no such authorization and approval is required.

A competing bidder that submits Required Bid Documents meeting the above criteria will be a "Qualified Bidder." The offer of WSB set forth in the APA shall be deemed to constitute a Qualified Bid and WSB is deemed to be a Qualified Bidder. The Debtor may extend the Bid Deadline once or successively as to any specific prospective bidders without further notice, but is not obligated to do so.

Irrevocability of Bids. Bids shall be deemed irrevocable offers to acquire the Assets and shall remain irrevocable and subject to acceptance by the Debtor until the Debtor has designated the Successful Bid and Backup Bid (as defined herein) and the Bankruptcy Court has approved the Debtor's acceptance of the Successful Bid and designation of Backup Bid, at which time any other bids (except for the Backup Bid) shall be deemed rejected and such rejected bidders' Deposits returned, and the Backup Bid shall be deemed irrevocable until the third business day after the closing deadline for the Successful Bid.

**PLEASE TAKE FURTHER NOTICE THAT**, if at least two Qualified Bids are submitted by the Bid Deadline, then the Debtor shall conduct a public auction (the "Auction") with respect to the Proposed Sale. **The Auction, should one be required, will take place beginning at 10:00 a.m. (prevailing Eastern Time) on October 16, 2015 at the offices of the Debtor's bankruptcy counsel, Casner & Edwards, LLP, 303 Congress Street, Boston, Massachusetts**, or such other time or place as the Debtor shall notify all Qualified Bidders who have submitted Qualified Bids. Only Qualified Bidders who have submitted a Qualified Bid will be eligible to participate at the Auction. At the Auction, each Qualified Bidder's auction bid(s) shall be deemed to be on the same terms and conditions as such bidder's Qualified Bid as set forth in its Asset Purchase Agreement, except for the offer price and otherwise as expressly agreed upon by the Debtor. The Auction may be conducted as an open bid auction or by sealed-bid, and on such other terms and conditions as specified by the Debtor at the Auction. At the conclusion of the bidding, the Debtor will determine (after consultation with any creditors' committee, if one is appointed), and then announce, the highest or best bid for the Assets (the "Successful Bid") and the Qualified Bidder submitting such bid (the "Successful Bidder"), subject only to entry by the Bankruptcy Court of an order approving the Successful Bid and authorizing the Debtor to consummate the sale following the conclusion of the hearing to consider approval of the Sale Motion and the Proposed Sale, upon which the proposed sale shall proceed to closing as provided by and pursuant to the terms and conditions of the APA (as it may be modified to reflect the Successful Bid and any related agreements between the Successful Bidder and the Debtor approved by, or as otherwise directed by, order of the Bankruptcy Court). The Debtor's presentation to the Bankruptcy Court for approval of a particular Qualified Bid does not constitute the Debtor's acceptance of the bid. The Debtor will have accepted a bid only when the bid has been approved by the Bankruptcy Court and the Debtor has executed the final form of the APA embodying the sale of the Assets as approved by the Bankruptcy Court.

Acceptance of Qualified Bid. The Debtor's presentation to the Bankruptcy Court for approval of a particular Qualified Bid does not constitute the Debtor's acceptance of the bid. The Debtor will have accepted a bid only when the bid has been approved by the Bankruptcy Court and the

Debtor has executed the final form of the APA embodying the sale of the Assets as approved by the Bankruptcy Court.

Backup Bid. If an Auction is conducted, then, at the conclusions of the Auction, the Debtor intends to designate a competing Bid ("Backup Bid") that shall be substituted for the Successful Bid in the event that the Successful Bidder is unable to consummate its acquisition of the Assets. By submitting a Bid or participating in the Auction, each Bidder acknowledges and agrees that the Debtor may designate its Bid (whether submitted prior to or at the Auction) as a Backup Bid, that such Backup Bid shall remain open for acceptance by the Debtor until the third business day following the closing deadline established for the Successful Bid, and that the Debtor, as security for closing of the Backup Bid transaction, may retain such Backup Bidder's Deposit pending consummation of the sale of the Assets to the Successful Bidder (in which case such Deposit shall be returned to the Backup Bidder within three (3) business days after closing of the sale to the Successful Bidder). If the Successful Bidder fails to close its Successful Bid by the applicable closing deadline (including as it may be extended for up to 30 days by agreement of the Debtor or order of the Bankruptcy Court), then (i) the Debtor shall be deemed to have accepted the Backup Bid as a replacement Successful Bid (the "Replacement Successful Bid"), and (ii) the Replacement Successful Bid shall thereafter for purposes of these Sale Procedures be deemed to be the Successful Bid except that the closing deadline for the Replacement Successful Bid shall be recomputed  for such Bid as if the Sale Order had been entered on the defaulting Successful Bidder's closing deadline.

Agreed Damages; Retention of Deposit. If the Successful Bidder fails to timely close its purchase of the Assets for any reason other than the Debtor's breach of the Asset Purchase Agreement, then such Successful Bidder's Deposit shall be retained by the Debtor as liquidated damages, and the Debtor may proceed to close the sale of the Assets with the Backup Bidder.

**PLEASE TAKE FURTHER NOTICE THAT** any interested party requesting additional information with respect to the Proposed Sale or with respect to submitting a bid to purchase the Assets may (in addition to contacting the Debtor as set forth above) contact counsel to the Debtor, Michael J. Goldberg, Casner & Edwards, LLP, 303 Congress Street, Boston, MA 02210, Phone (617) 426-5900, email goldberg@casneredwards.com, provided that notwithstanding any information which may be provided, all entities submitting an offer shall be relying upon their own independent due diligence and analysis.

**PLEASE TAKE FURTHER NOTICE THAT** copies of the Sale Motion and the APA may be obtained from the Office of the Clerk of the Bankruptcy Court, Donohue Federal Building, 595 Main Street, Worcester, MA 01608, or without cost by making a written request to undersigned counsel to the Debtor.

Dated: September __, 2015            CAMBRIDGE ENDOSCOPIC DEVICES, INC.


By its attorneys,

 /s/ A. Davis Whitesell            
Michael J. Goldberg (BBO #551869)

A. Davis Whitesell (BBO #551462)
Casner & Edwards, LLP
303 Congress Street
Boston, MA  02210
Tel: 617-426-5900
Email: whitesell@casneredwards.com

## CERTIFICATE OF SERVICE

I, A. Davis Whitesell, Esq., hereby certify that on September ___, 2015, I caused a copy of the foregoing **Debtor's Motion for Authority to Sell Substantially All Assets Free and Clear of Liens, Claims, Encumbrances, and Interests Pursuant to Section 363 of the Bankruptcy Code and Court-Approved Sale Procedures**, with all Exhibits, to be served (A) by email through the Court's ECF system to all entities that are registered users thereof in this Chapter 11 case (including the United States Trustee), and (B) by United States first class mail (i) to the Debtor's 20 largest unsecured creditors as listed on the attached service list, and (ii) to the Debtor and the agent for the Debtor's secured lenders (and stalking horse bidder) and its counsel at the mailing addresses set forth below:

Cambridge Endoscopic Devices, Inc.
Attn:  John Schulte
119 Herbert Street
Framingham, MA 01702

White Sand Beach LLC
c/o Robinson Brog Leinwand Greene Genovese & Gluck P.C.
875 Third Avenue
New York, NY 10022

Dated: September ___, 2015          /s/ A. Davis Whitesell_____
                                    A. Davis Whitesell (BBO#551462)
                                    Casner & Edwards, LLP
                                    303 Congress Street
                                    Boston, MA  02210
                                    Tel: 617-426-5900
                                    Fax: 617-426-8810
                                    Email: whitesell@casneredwards.com

David Kaplan
D. Kaplan LTD Partnership
11049E. Tamarisk Way
Scottsdale, AZ 85262

Michael Simons
16 Minor Street, #503
Boston, MA 02215

David Driscoll
1201 Canton Ave
Milton, MA 01286

Paul Mraz
46 partridge Road
Duxbury, MA 02332

David Driscoll
1201 Canton Ave
Milton, MA 01286

Paul Mraz
46 partridge Road
Duxbury, MA 02332

David Kaplan
David and Helen Kaplan JTWROS
11049E. Tamarisk Way
Scottsdale, AZ 85262

Peter Jenkins
17 Chachapassett Road
Barrington, RI 02806

Goodwin Procter, LLP
Exchange Place 53State Street
Boston, MA 02109

Phillip Henderson
67 Anawam Road
Waban, MA 02468

Gunderson Dettmer
1200 Seaport Blvd.
Boston, MA 02210

Schreiber, Saul N.
Saul and Elaine Schreiber Family Trust
Ahad Ha'am 13/5
ISRAEL

Morey Levovitz
Independent Tallow, Inc
1215 Chestnut Street
Newton Upper Falls, MA 02464

Schreiber, Saul N.
Saul and Elaine Schreiber Family Trust
Ahad Ha'am 13/5
ISRAEL

Jin Young Kim
Sundang Raemian, E-pyunhansesang
Apt 305/1101, 839 Sunddang-dong
SOUTH KOREA

Stanley Goldstein
24 Hobart Terrace
Newton Center, MA 02459

Joong Hahn
374 Sagamore Road
Northfield, OH 44067

Walter Winshall
3 Ferndale Road
Weston, MA 02493

Michael Rubin
539 Sunset Boulevar
Baton Rouge, LA 70808

Adam J. Greene, Esq.
White Sand Beach
1270, Avenue of the Americas
New York, NY 10020