ASSET PURCHASE AGREEMENT

DATED AS OF

AUGUST 26, 2015

BY AND BETWEEN

CAMBRIDGE ENDOSCOPIC DEVICES INC., AND

WHITE SAND BEACH LLC

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is made as of August 26, 2015 by and among Cambridge Endoscopic Devices, Inc., a Delaware corporation with an address at 119 Herbert Street, Framingham, MA 01702, ("Seller" or the "Company") and White Sand Beach, LLC, a Delaware limited liability company with an address at c/o Robinson Brog  Leinwand Greene Genovese & Gluck P.C. 875 Third Avenue New York, NY 10022, as agent for the Secured Lenders identified on Exhibit A hereto ("Buyer").

## RECITALS

**WHEREAS**,  Seller is indebted to Buyer in the amount of approximately $9,729,845 (the "Secured Claim"), which Secured Claim is secured by a first priority security interest in substantially all of Seller's assets (the "Collateral").

**WHEREAS**,  Seller has ceased and is in the process of winding down ongoing business operations, and is unable to pay its indebtedness to Buyer.  Buyer desires that Seller file a voluntary petition under Chapter 11 of the Bankruptcy Code and pursue for Buyer's benefit a sale of the Collateral pursuant to Section 363 of the Bankruptcy Code.

**WHEREAS**,  Seller has insufficient funds to pay the anticipated expenses of administration of a Chapter 11 case, including the cost of pursuing the desired sale of the Collateral and, potentially, a subsequent liquidating plan.  Seller desires to make appropriate arrangements to fund  the anticipated costs of a Chapter 11 case filed to effect a sale of the Collateral.

**WHEREAS**, in connection with this proposed agreement with Seller concerning the sale of the Collateral in a Chapter 11 case, Buyer is willing (i) to allow Seller to utilize a portion of the Deposit (as defined herein) to fund the reasonably anticipated costs of effectuating a sale of the Collateral through a Chapter 11 case, so long as the funds made available from the Deposit are deemed to be a credit against the Cash Consideration to be paid as part of the Purchase Price, and (ii) to fund, as part of the purchase price for the Collateral, the reasonably anticipated costs of the Chapter 11 case, and, in consideration thereof, Seller has agreed to pursue a Section 363 sale of the Collateral through the filing of a voluntary petition (the "Bankruptcy Petition") for relief under Chapter 11 of the United States Code, 11 U.S.C. Sections 101, et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"), thereby commencing Seller's Chapter 11 case (the "Chapter 11 Case"); and

1

**WHEREAS**, subject to the approval of the Bankruptcy Court, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, subject to higher and better offers, the Assets (as hereinafter defined), excluding the Excluded Assets (as hereinafter defined), all upon the terms and subject to the conditions set forth in this Agreement;

**WHEREAS**, in connection with the transactions contemplated hereby, Buyer may designate prior to Closing, one or more of its Affiliates to purchase the Acquired Assets and to assume the Assumed Liabilities pursuant to Section 11.07.

**NOW, THEREFORE,** in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and intending to be legally bound, Seller and Buyer agree as follows.

## ARTICLE 1
## DEFINITIONS

SECTION 1.01   Definitions.

For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"Acquired Assets" has the meaning set forth in Section 2.01.

"Agreement" has the meaning set forth in the preamble.

"Allocation" has the meaning set forth in Section 2.06.

"Alternate Buyer" means a purchaser of the Assets other than Buyer, as determined by the Bid Procedures and confirmed by the Sale Order.

"Assigned Contracts" means the Contracts described in Section 1.01 of Seller's Disclosure Schedule, as such section may be amended pursuant to Section 2.02(b)(i). Notwithstanding anything herein to the contrary, "Assigned Contracts" shall not include any Contracts that are Excluded Assets.

"Assignment of Copyrights" has the meaning set forth in Section 3.03(c).

"Assignment of Domain Names" has the meaning set forth in Section 3.03(c).

"Assignment of Patents" has the meaning set forth in Section 3.03(c).

"Assignment of Trademarks" has the meaning set forth in Section 3.03(c).

"Assumed Liabilities" has the meaning set forth in Section 2.03.

"Assumption Agreement" has the meaning set forth in Section 2.03.

"Auction" has the meaning set forth in Section 6.03.

2

"Avoidance Actions" means any and all claims and causes of action of Seller and its bankruptcy estate arising under, or assertable pursuant to, chapter 5 of the Bankruptcy Code.

"Bankruptcy Court" means the court having jurisdiction over Sellers bankruptcy case.

"Bid Procedures" means the procedures governing the solicitation, submission and consideration of competing offers to acquire the Assets, as established by the Bankruptcy Court upon motion of Seller on notice to Buyer, which Bid Procedures (as they may be amended, modified, supplemented from time to time) shall include a cash bid of not less than $3,150,000 and be in form and substance reasonably acceptable to Buyer.

"Bid Procedures Order" means an Order of the Bankruptcy Court establishing the Bid Procedures, which Order, as it may be amended, modified, or supplemented from time to time, shall be in form and substance reasonably acceptable to Buyer.

"Bill of Sale" means a bill of sale covering the Assets

"Business" means the operation of a medical device company engaged in the development and marketing of hand-held laproscopic devices which provide fully articulating motion at the tip.

"Business Day" means any day of the year on which national banking institutions in Boston, Massachusetts are open to the public for conducting business and are not required or authorized to close.

"Business Trade Secrets" has the meaning set forth in Section 4.16(f).

"Buyer" has the meaning set forth in the preamble.

"Buyer Termination Notice" has the meaning set forth in Section 10.01(b)(i).

"Cash Consideration" has the meaning set forth in Section 2.05(i).

"Chapter 11 Case" has the meaning set forth in the recitals.

"Closing" has the meaning set forth in Section 2.06.

"Closing Date" means the date and time as of which the Closing occurs as set forth in Section 3.01.

"Consent" means any consent, waiver, approval, Order or authorization of, or registration, declaration or filing with or notice to, any Governmental Authority or other Person.

"Consent Pending Contract" has the meaning set forth in Section 6.04(c).

"Contract" means any agreement, contract, obligation, understanding, or undertaking (whether written or oral) or any other instrument that is legally binding.

"Contract Retention Period" has the meaning set forth in Section 6.04(d).

"Copyrights" means all United States and foreign copyrights and copyrightable subject matter (including, but not limited to, Software), whether registered or unregistered, including all United States copyright registrations and applications for registration and foreign equivalents, all moral rights, all common-law copyright rights, and all rights to register and obtain renewals, extensions, restorations and reversions of copyright registrations, together with all other copyright rights accruing by reason of any international copyright convention.

"Cure Costs" means, for any given Assigned Contract the amounts required to cure any defaults arising under such Assigned Contract, as applicable, including for any pecuniary losses arising from such defaults, and all contingent, unliquidated or unmatured liabilities under such Assigned Contracts, as applicable, as may be required to be paid upon the assumption and assignment of such Assigned Contract, as applicable pursuant to section 365(b) of the Bankruptcy Code.

"Current Accounts Receivable" means the aggregate amount of all Receivables (other than any intercompany receivables) that are less than 90 days outstanding from the date of invoice.

"Data" means all information and data, whether in printed or electronic form and whether contained in a database or otherwise.

"Deposit" has the meaning set forth in Section 2.08.

"Determined Cure Costs" means, in the aggregate, all Cure Costs payable to counterparties of Assigned Contracts as such amounts are determined pursuant to a Final Order of the Bankruptcy Court, which may be the Sale Order (as it shall have become a Final Order).

"Domain Names" means any alphanumeric designation registered with or assigned by a domain name registrar, registry or domain name registration authority as part of an electronic address on the Internet. A Domain Name may or may not also be a Trademark.

"Encumbrance" means any charge, lien, claim, mortgage, lease, hypothecation, deed of trust, pledge, security interest, option, right of use, first offer or first refusal, easement, servitude, restrictive covenant, encroachment, encumbrance, or other similar restriction of any kind.

"Environmental, Health and Safety Laws" has the meaning set forth in Section 4.07(b).

"Environmental, Health and Safety Permits and Licenses" means any Consent required under any Environmental, Health and Safety Laws.

4

"Equipment" means all furniture, equipment, computers, machinery, apparatus, appliances, implements, spare parts, supplies and all other tangible personal property of every kind and description owned by Seller.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Estimated Cure Costs" has the meaning set forth in Section 6.05(b).

"Excluded Assets" has the meaning set forth in Section 2.02.

"Excluded Liabilities" has the meaning set forth in Section 2.03(b).

"Final Order" or "Final …Order" means an action taken or Order issued by the Bankruptcy Court as to which: (i) no request for stay of the Proceeding or Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the Proceeding or Order, or protest of any kind, is pending and the time for filing any such petition or protest is passed; (iii) the Order is not under reconsideration or review and the time for such reconsideration or review has passed; and (iv) the Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"GAAP" means United States generally accepted accounting principles.

"Governmental Authority" means any United States federal, state or local, or any foreign (federal, state, provincial, local or otherwise) government, governmental authority, regulatory or administrative authority or any court, tribunal or judicial body having jurisdiction, or any quasi-governmental or private body exercising any regulatory, governmental or quasi-governmental authority, or any self-regulatory organization.

"Hazardous Substance" means any "pollutant", "contaminant", "solid waste", "hazardous waste", "hazardous material" or "hazardous substance" under any Environmental, Health and Safety Laws.

"Indebtedness" of any Person means, without duplication, (i) the principal of and premium (if any) in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued current liabilities arising in the ordinary course of the business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any Persons for the payment of which such Person

5

is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Intellectual Property" means all of the following and similar intangible property and related proprietary rights, interests and protections, however arising, pursuant to the Laws of any jurisdiction throughout the world:  (a) trademarks, service marks, trade names, brand names, logos, trade dress and other proprietary indicia of goods and services, whether registered, unregistered or arising by Law, and all registrations and applications for registration of such trademarks, including intent-to-use applications, and all issuances, extensions and renewals of such registrations and applications; (b) internet domain names, whether or not trademarks, registered in any generic top level domain by any authorized private registrar or Governmental Authority; (c) original works of authorship in any medium of expression, whether or not published, all copyrights (whether registered, unregistered or arising by Law), all registrations and applications for registration of such copyrights, and all issuances, extensions and renewals of such registrations and applications; (d) confidential information, formulas, designs, devices, technology, know-how, research and development, inventions, methods, processes, compositions and other trade secrets, whether or not patentable; and (e) patented and patentable designs and inventions, all design, plant and utility patents, letters patent, utility models, pending patent applications and provisional applications and all issuances, divisions, continuations, continuations-in-part, reissues, extensions, reexaminations and renewals of such patents and applications.

"Inventory" means all inventory and all finished goods, merchandise, work in progress, residual by-products, samples, supplies, spare parts, shipping materials, packaging materials, raw materials and other consumables relating to the Business and maintained, held or stored by or for Seller as of the Closing Date, wherever located, and any prepaid deposits for any of the same.

"IRC" means the Internal Revenue Code of 1986, as amended, and regulations issued by the IRS pursuant to the Internal Revenue Code.

"IRS" means the Internal Revenue Service of the United States.

"IT Systems" means electronic data processing, information, recordkeeping, communications, telecommunications, networking, account management, inventory management and other such applications, Software, and hardware, equipment and services (including, but not limited to, all applications and Software installed on all hardware and equipment, and all databases, firmware, and related documentation), and Internet websites and related content.

"Law" means any federal, state, regional, local or foreign law, statute, ordinance, code, treaty, rule, regulation, Order, action or requirement of any Governmental Authority.

"Liability" means all liabilities and obligations (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due).

"License" has the meaning set forth in Section 4.16(b).

"Material Adverse Effect" means any fact, condition, change, violation, inaccuracy, circumstance, effect or event ("Effect"), individually or in the aggregate, (i) that has, or would reasonably be likely to have, a material adverse effect on the assets, liabilities, properties, results of operations or financial condition of the Business (excluding the Excluded Assets and the Excluded Liabilities), and the Acquired Assets and the Assumed Liabilities, taken as a whole, or (ii) has or would reasonably be likely to prevent, materially delay or materially impair the ability of the Sellers to perform their respective obligations hereunder or to consummate the transactions contemplated hereby; provided, however, that "Material Adverse Effect" shall not include the following, nor shall any of the following be taken into account in determining whether there has been a Material Adverse Effect: (a) events or conditions that generally affect the industry in which the Seller; (b) general business or economic conditions; (c) national or international political or social conditions, including the engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any actual or threatened military or terrorist attack; (d) the conditions of any financial, banking, or securities markets; (e) changes in GAAP made after the date hereof; (f) acts or omissions of any Seller carried out (or omitted to be carried out) in accordance with this Agreement or upon the written consent of Buyer in accordance with this Agreement; or (g) any condition arising by reason of the commencement of the Chapter 11 Case; unless, in the case of clause (a), (b), (c), (d) or (e) above, such Effect would reasonably be expected to result in a materially disproportionate adverse effect on, or change in, the Acquired Assets, the Assumed Liabilities or the Business (other than the Excluded Assets and Excluded Liabilities), taken as a whole, relative to the businesses of other comparable companies in the industries in which the Business operates.

"Material Contract" means any of the following Contracts relating to, connected with or used in the Business, to which any Seller is a party, or by which any of the Acquired Assets or any of the assets and properties of Seller are bound:

(i)     any limited liability company agreement, joint venture, partnership agreement, profit sharing arrangement or other similar agreement or arrangement relating to the formation, creation, operation, management or control of any partnership or joint venture with regard to which a Seller is a party;

(ii)     any Contract for the purchase or sale of goods, services, assets, properties, rights and claims resulting in expenses by Seller in excess of $50,000;

(iii)     any Contract for the sale of goods, services, assets, properties, rights or claims resulting in revenue to the in excess of $50,000;

7

(iv)     any Contract relating to (A) any outstanding capital lease obligations requiring annual payments in excess of $50,000 or (B) conditional sale arrangements;

(v)     a loan, guarantee of Indebtedness or Contract relating to Indebtedness of Seller, or pursuant to which Seller has mortgaged, pledged or otherwise placed an Encumbrance on any portion of the properties or assets of Seller;

(vi)     any Contract that requires Seller to make a loan or capital contribution to or investment in any Person;

(vii)     any Benefit Plan;

(viii)     any Contract for the lease of tangible personal property;

(ix)     any Contract providing for the indemnification by a Seller;

(x)     any Contract which purports to limit the right of Seller to engage freely or compete in any line of business or to compete with any Person or operate in any location;

(xi)     any Contract that relates to the development, ownership, licensing or use of Intellectual Property (other than a shrink wrap or similar license for generally available "off-the-shelf" software);

(xii)     a settlement or similar agreement with any Governmental Authority or Order or Consent of a Governmental Authority to which Seller is subject involving future performance by Seller which is material to Seller, taken as a whole;

(xiii)     any other Contract that is material to Seller.

"Order" means any award, writ, injunction, judgment, order, ruling, directive, stipulation, determination or decree entered, issued, made, or rendered by or with any Governmental Authority.

"Outside Date" means November 30, 2015.

"Patents" means United States and foreign patents (including certificates of invention and other patent equivalents), patent applications, provisional applications and patents issuing therefrom, as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals, patent disclosures, discoveries, ideas, inventions (whether or not patentable or reduced to practice) or improvements thereto.

"Permitted Encumbrances" means (i) statutory liens for current property Taxes and assessments (A) not yet due and payable or (B) being contested in good faith by appropriate proceedings for which adequate reserves have been made in accordance with GAAP, including liens for *ad valorem* Taxes and statutory liens not yet due and payable arising other than by reason of any default by Sellers, (ii) easements, covenants, conditions, restrictions and other similar matters of record on real property, or  leasehold estates that do not in any material respect

8

detract from the value thereof and do not individually or in the aggregate in any material respect interfere with the present use of the property subject thereto, (iii) Encumbrances that constitute or secure Assumed Liabilities (including Encumbrances arising under the Assigned Contracts), (iv) Encumbrances, title exceptions or other imperfections of title caused by or resulting from the acts of Buyer or any of its Affiliates, employees, officers, directors, agents, contractors, invitees or licensees, (v) landlords', carriers', warehousemen's, mechanics', suppliers', materialmen's, repairmen's liens or other like Encumbrances arising in the ordinary course of business with respect to amounts not yet overdue or amounts being contested in good faith by appropriate Proceedings, (vi) Laws now or hereafter in effect relating to the Real Property that are not violated by the current use and operation by Seller of the Real Property, (vii) valid and perfected purchase money security interests in any of the Assets having priority over Buyer's security interest in such Assets,  and (viii) the other Encumbrances listed in Section 1.01(e) of Seller's Disclosure Schedule.

"Person" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization, labor union or other entity or Governmental Authority.

"Petition Date" means the date of Seller's filing of the voluntary petition commencing the Chapter 11 Case.

"Proceeding" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"Purchase Price" has the meaning set forth in Section 2.05.

"Real Property" means, collectively, any owned real property, or leased real property.

"Registered" with respect to Intellectual Property, means issued, registered, renewed or the subject of a pending application.

"Release" means any past or present spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of a Hazardous Substance into the environment (including the abandonment or discharging of barrels, containers and other closed receptacles containing any Hazardous Substance).

"Representative" means with respect to a particular Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants, financial advisors and restructuring advisors.

"Sale Hearing" means the date established by the Bankruptcy Court for the hearing to consider approval of Seller's proposed sale of the Acquired Assets pursuant to this Agreement.

9

"Sale Order" means a Final Order of the Bankruptcy Court pursuant to sections 105, 363 and 365 of the Bankruptcy Code authorizing and approving, inter alia, the sale of the Acquired Assets to Buyer on the terms and conditions set forth herein, free and clear of all Encumbrances other than Permitted Encumbrances, and the assumption by Seller, and assignment to Buyer, of the Assigned Contracts, and containing a finding that Buyer has acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code, which Order, including exhibits, and as the same may be amended, modified, supplemented from time to time, shall be in form and substance reasonably acceptable to Buyer.

"Secured Lenders" means the parties identified on Exhibit A attached hereto.

"Seller" has the meaning set forth in the preamble.

"Seller's Disclosure Schedule" means the Disclosure Schedule delivered by Sellers to Buyer on the date hereof in draft form attached hereto as **Exhibit B**, it being understood and agreed that the final form of Seller's Disclosure Schedule shall be delivered by Sellers to Buyer in accordance with Section 7.05(a) hereof.

"Seller's Knowledge" means the actual knowledge of the persons listed in Section 1.01(d) of Seller's Disclosure Schedule.

"Seller's Termination Notice" has the meaning set forth in Section 10.01(c).

"Software" means all computer software programs (whether in source code, object code or other form) and software systems (whether owned, licensed, or used), including all databases, compilations, tool sets, compilers, "proprietary" languages, related documentation, technical manuals and materials, and any license to use or other rights related to the foregoing.

"Successful Bid" has the meaning set forth in Section 6.03.

"Tax" or "Taxes" (and with correlative meaning, "Taxable" and "Taxing") means (i) any federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the IRC), natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar taxes, duty, levy or other governmental charge or assessment or deficiencies thereof (including all interest and penalties thereon and additions thereto whether disputed or not) and (ii) any transferee Liability in respect of any items described in clause (i) above.

"Tax Return" means any return, declaration, report, claim for refund, information return, or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed in connection with the determination, assessment, or collection of any Tax or the administration of any Tax Laws.

10

"Third Party Consents" means the Consents set forth in Section 1.01(e) of Seller's Disclosure Schedule.

"Trademarks" means United States, state and foreign trademarks, service marks, logos, slogans, brand names, certification names, collective marks, trade dress and trade names (including all assumed or fictitious names), and any other indicia of source of goods and services, designs and logotypes related to the above, in any and all forms, whether registered or unregistered, and registrations and pending applications to register the foregoing (including intent to use applications), and all goodwill related to or symbolized by the foregoing.

"Trade Payables" means any and all trade payables of Seller arising from the conduct of the Business, incurred by Seller prior to the Closing and that are not yet due and payable to such third parties on or prior to the Closing Date in accordance with the terms of the Contracts giving rise to such trade payables, in each case solely to the extent such trade payables are incurred in the ordinary course of business.

"Trade Secrets" means confidential and proprietary information and trade secrets and know-how, including, without limitation, processes, schematics, databases, formulae, prototypes, models, drawings and customer lists.

"Transaction Documents" means this Agreement and any other agreements, instruments, or documents entered into pursuant to this Agreement.

"Transfer" has the meaning set forth in Section 6.04(c).

"Transfer Taxes" has the meaning set forth in Section 7.07(b).

SECTION 1.02   Other Definitions and Interpretive Matters.

(a)      For purposes of this Agreement, the following rules of interpretation shall apply, except to the extent otherwise expressly provided or the context otherwise requires:

(i)      when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day;

(ii)      any reference in this Agreement to $ shall mean U.S. dollars;

(iii)      all Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement;

11

(iv)    any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa;

(v)    the words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear; and

(vi)    the word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)    The parties hereto participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE 2
## PURCHASE AND SALE; PURCHASE PRICE

SECTION 2.01    Purchase and Sale of Acquired Assets.

Upon the terms, and subject to the conditions, of this Agreement, at Closing:

(a)    Seller shall, sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer shall purchase and acquire, free and clear of all Encumbrances (other than Permitted Encumbrances), all right, title and interest of Seller in, to or under all of the properties, assets, rights and claims of Seller (other than any Excluded Assets) of every kind and description, wherever located, real, personal or mixed, tangible or intangible, owned, leased, licensed, used, useful or held for use in or relating to the Business (collectively, the "Acquired Assets"), including, but not limited to, the following including, but not limited to, the following:

(i)    INTENTIONALLY OMITTED;

(ii)    all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories of the Company including any Inventory located at contract manufacturers;

(iii)    all Intellectual Property assets;

(iv)    all furniture, fixtures, equipment, machinery, tools, molds, office equipment, supplies, computers, telephones and other tangible personal property, whether in the Company's possession or located at third parties;

12

(v)     all rights of the Company in and to any causes of actions of action (whether arising by way of counterclaim or otherwise) being pursued by, or any defenses or offsets asserted by, the Company against a non-Company party to an Assigned Contract with respect to such Assigned Contract, but not including any Avoidance Actions except as expressly provided by Order of the Bankruptcy Court incident to Buyer's assumption of such Assigned Contract;

(vi)     all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees (other than any such item relating to the payment of Taxes);

(vii)     all of the Company's rights under warranties, indemnities and all similar rights against third parties to the extent related to the Assets;

(viii)     all insurance benefits, including rights and proceeds, arising from or relating to the Assets;

(ix)     originals, or where not available, copies, of all books and records, including books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, existing and prospective customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, internal financial statements, marketing and promotional surveys, material and research and intellectual property files relating to the Intellectual Property Assets and the Intellectual Property Licenses ("Books and Records");

(x)     all FDA regulatory approvals or approvals to market (510ks);

(xi)     all marketing reports and analyses;

(xii)     all pre-clinical and clinical research;

(xiii)     all intellectual property licenses;

(xiv)     all software licenses for the Company's Quality and Regulatory system, together with any and all information of the Company in such systems;

(xv)     all design history files, device master record and device history record documents, including specifications, drawings, technical data and other information regarding, but not limited to, research and development, inventions, designs, discoveries, developments, processes, manufacture, analytical and quality control records; and

13

(xvi)   the Assigned Contracts.

SECTION 2.02   Excluded Assets.

(a)   Notwithstanding anything in Section 2.01 to the contrary, nothing herein shall be deemed to sell, transfer, assign or convey the following assets to Buyer, and Sellers shall retain all of their respective rights, title and interests in, to and under, and Buyer shall have no rights with respect to, any of the following (collectively, the "Excluded Assets"):

(i)   any portion of the Purchase Price delivered (or required to be delivered) to Seller pursuant to this Agreement;

(ii)   any Contract or lease that is not an Assigned Contract, respectively (including, without limitation, any Contract that is excluded pursuant to Section 2.02(b)(i)  or Section 6.05(c) hereof), and any rights or benefits thereunder;

(iii)   any rights, claims or causes of action of Sellers under this Agreement or any other Transaction Document;

(iv)   any Equity Interests in Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other Equity Interests in Seller;

(v)   any Benefit Plan;

(vi)   any account receivable;

(vii)   any employment contract or employment letter;

(viii)   all cash on hand at Closing (including the Cash Consideration);

(ix)   rights or interest Seller has to any Real Property; and

(x)   the Avoidance Actions.

(b)   At any time not later than fifteen (15) calendar days prior to the Sale Hearing, and subject to Section 6.05(c), Buyer, in its sole discretion by written notice to Seller, may amend Seller's Disclosure Schedule to exclude from being assigned any Contract, whereupon such Contract so excluded shall not constitute an "Assigned Contract", respectively (and shall therefore constitute an Excluded Asset), and Buyer shall not acquire any rights, or assume any Liabilities, with respect thereto.  Buyer acknowledges and agrees that there shall be no reduction in the Purchase Price if it elects to exclude from being assigned any Contracts pursuant to the preceding sentence.

14

SECTION 2.03   Assumed Liabilities

Upon the terms and subject to the conditions of this Agreement, at Closing, Buyer shall execute and deliver to Sellers an assumption agreement (the "Assumption Agreement") pursuant to which Buyer shall assume and agree to discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof), the following Liabilities (collectively the "Assumed Liabilities") and no others:

(a)   all Liabilities arising after the Closing Date solely in connection with the ownership, operation and use of the Acquired Assets or the operation of the Business from and after the Closing Date;

(b)   all Liabilities of Seller under the Assigned Contracts, including all Determined Cure Costs (to be satisfied in accordance with Section 6.05(a)) and all of Buyer's payment obligations under Section 6.04(d); and

(c)   all other Liabilities set forth in Section 2.03(c) of Seller's Disclosure Schedule.

SECTION 2.04   Excluded Liabilities.

Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume, and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability of Sellers, and Sellers shall be solely and exclusively liable with respect thereto, other than the Assumed Liabilities (collectively the "Excluded Liabilities"). The Excluded Liabilities include, but are not limited to, the following:

(a)   other than as specifically set forth in Section 2.03, any Liability of Sellers or their Affiliates arising out of, or relating to, this Agreement or the transactions contemplated by this Agreement, whether incurred prior to, at or subsequent to the Closing Date, including all Liabilities for the expenses of Sellers or any of their Affiliates for the negotiation and preparation of this Agreement and expenses incurred in connection with its Chapter 11 Case;

(b)   other than as specifically set forth in Section 2.03, any Liability relating to events or conditions occurring or existing in connection with, or arising out of, the Business as operated prior to the Closing Date, or the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of any Acquired Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Business);

(c)   other than as specifically set forth in Section 2.03, any Liability to any current or former employee, independent contractor, consultant or agent at any time employed or engaged by the Seller, or who otherwise provided services to the Seller, at any time, or to any such Person's spouse, children, other dependents or beneficiaries, with respect to incidents, events, exposures or circumstances occurring at any time during the period or periods of any such Person's employment by the Seller, whenever such claims mature or are asserted, including (except as otherwise specifically set forth herein), all Liabilities arising (i) under any

15

employment, wage and hour restriction, equal opportunity, discrimination, plant closing or immigration and naturalization Laws, or (ii) in connection with any workers' compensation or any other employee health, accident, disability or safety claims;

(d)   other than as specifically set forth in <u>Section 2.03</u>, any Liability for Taxes attributable to periods prior to the Closing Date;

(e)   any Liability incurred by Seller or its respective directors, officers, stockholders, agents or employees (acting in such capacities) at any time;

(f)   any Liabilities of any of Sellers not related to the operation of the Business;

(g)   any Liabilities for personal injury claims, product recalls or similar claims or actions relating to the operation of the Business prior to the Closing;

(h)   any Liability relating to or arising out of any violation of an applicable Law or Order prior to the Closing by Seller; and

(i)   any Liability relating to or arising out of the ownership or operation of an Excluded Asset; and

Nothing contained in this Agreement shall require the Buyer to pay or discharge any Assumed Liabilities (i) prior to such Assumed Liabilities becoming due and payable in accordance with (if applicable) the underlying terms of any Contracts giving rise to or governing such Assumed Liabilities or (ii) so long as the Buyer shall in good faith contest the amount or validity thereof(provided Buyer may not contest Determined Cure Costs, or any of its payment obligations provided hereunder.

SECTION 2.05   <u>Purchase Price</u>. In addition to the assumption by Buyer at Closing of the Assumed Liabilities (including, among other things, the Determined Cure Costs) pursuant to <u>Section 2.03</u>, the purchase price (the "<u>Purchase Price</u>") for the purchase, sale, assignment and conveyance of Seller's right, title and interest in, to and under the Acquired Assets, shall be an amount equal to $3,100,000 consisting of:

(i)   cash in the amount of $100,000 (the "<u>Cash Consideration</u>"), inclusive of the Deposit in the amount of $32,200, which shall be credited against payment of the Cash Consideration at Closing; plus

(ii)   a credit bid pursuant to section 363(k) of the Bankruptcy Code consisting of $3,000,000 from Buyer's secured claim against Seller. The Bid Procedures Order shall provide that Buyer shall be permitted, but not required, to increase the amount of its credit bid pursuant to section 363(k) up to the full amount of the Secured Claim at the Auction; provided that any such increased bid shall include Cash Consideration of no less than $100,000.

SECTION 2.06   <u>Payment of Purchase Price</u>. On the terms and subject to the conditions set forth in this Agreement, at Closing, Buyer shall pay to Seller an amount in cash equal to the

16

Cash Consideration (inclusive of the Deposit) by wire transfer of immediately available funds to the accounts designated in writing by Seller on the Closing Date.

      SECTION 2.07   Allocation of Purchase Price. The Purchase Price shall be allocated solely for federal income Tax purposes among the Acquired Assets and Assumed Liabilities in accordance with a schedule to be delivered by Buyer to Sellers within 30 days after the Closing Date (the "Allocation"). The Allocation shall be reasonable and shall be prepared in accordance with Section 1060 of the IRC and the regulations thereunder. Sellers shall be entitled to review and comment on the Allocation and Buyer shall consider in good faith Seller's comments thereon. Subject to the foregoing, the transactions contemplated hereby shall be reported in a manner consistent with the terms of this Agreement, including the Allocation, and none of Sellers nor Buyer shall take any position inconsistent therewith in any Tax Return, in any refund claim, in any litigation, or otherwise. Buyer and Sellers will each file IRS Form 8594, and all Tax Returns, in accordance with the Allocation agreed upon by the parties pursuant to the terms of this Section 2.06. Sellers and Buyer each agree to cooperate with each other in preparing IRS Form 8594, and to furnish the other with a copy of such form prepared in draft form within a reasonable period before its filing due date. If such Allocation is disputed by any Governmental Authority, Buyer or any Seller receiving notice of such dispute will promptly notify the other party, and the parties will use their reasonable best efforts to sustain the Allocation.

      SECTION 2.08   Buyer's Funding of Deposit. Immediately upon execution and delivery of this Agreement by Seller and Buyer, Buyer shall remit payment of $32,200 to Seller's bankruptcy counsel Casner & Edwards, LLP ("Casner") pursuant to wire instructions provided by Casner to Buyer's counsel, which $32,200 payment shall constitute the Deposit hereunder. The Deposit shall be non-refundable under any and all circumstances, including whether or not the Closing ever occurs and notwithstanding any default of this Agreement by Seller. Buyer's payment of the Deposit shall be a condition precedent to Seller's commencement of performance under this Agreement and Seller hereby agrees that in consideration for the Buyer creating a market as a stalking horse bidder, all preexisting claims of Seller against the Secured Lenders (if any) shall be deemed waived by Seller upon Seller's receipt of the Deposit.

      SECTION 2.09   Treatment of Buyer's Claim. Upon Closing of a sale where Buyer has made the Successful Bid and paid the Purchase Price, any remaining balance of Buyer's claims against Seller and its bankruptcy estate shall be deemed waived provided the Seller executes a general release of the Buyer and any of its affiliates of any and all claims Seller may have against Buyer, its members and its affiliates through and including the date of Closing. In the event that the Assets are sold to Alternate Buyer, then upon the closing under Alternate Buyer's asset purchase agreement, (i) Seller shall first receive $100,000 of the cash consideration paid by Alternate Buyer (the "First Tier Consideration"); (ii) Buyer shall next receive the additional consideration paid by Alternate Buyer up to $3,100,000 (the "Second Tier Consideration"); (iii) Buyer shall receive ninety percent (90%) of the consideration paid by Alternate Buyer in excess of $3,100,000, up to $4,000,000 (the "Third Tier Consideration") and Seller shall receive ten percent (10%) of the Third Tier Consideration; (iv) Buyer shall receive seventy five percent (75%) of the consideration paid by Alternate Buyer in excess of $4,000,000, up to $5,000,000 (the "Fourth Tier Consideration"), and Seller shall receive twenty five percent (25%) of the Fourth Tier Consideration; and (v) Buyer shall receive seventy percent (70%) of the

17

consideration paid by Alternate Buyer in excess of $5,000,000 (the "Fifth Tier Consideration"), and Seller shall receive thirty percent (30%) of the Fifth Tier Consideration up to the payment in full of the Secured Claim at which point the Seller shall receive 100% of the consideration.

## ARTICLE 3
## CLOSING

SECTION 3.01    Closing Date.

The consummation of the transactions contemplated by this Agreement, including the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing") shall take place (i) if Buyer has made the Successful Bid, at the offices of Robinson Brog Leinwand Greene Genovese & Gluck P.C. at 875 Third Avenue, New York, NY 10022, or (ii) if an Alternate Buyer has made the Successful Bid, at the offices of Canser & Edwards, LLP, 303 Congress Street, Boston, Massachusetts 02210, in either case at 10:00 a.m. Eastern time, on the 3rd Business Day following the date on which the conditions set forth in Article 8 and Article 9 have been satisfied or waived (other than those conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction of such conditions (or the waiver thereof by the party entitled to waive such conditions)), or at such other place or time as the parties hereto may mutually agree in writing. The date and time at which the Closing actually occurs shall be the "Closing Date."

SECTION 3.02    Closing Deliveries by Buyer.

At or prior to the Closing, Buyer shall deliver or cause to be delivered to Seller:

(a)    Cash equal to the Cash Consideration;

(b)    a certificate of an authorized officer of Buyer, dated as of the Closing Date, in form and substance reasonably satisfactory to Seller, as to a copy of the resolutions of the Manager of Buyer authorizing and approving Buyer's execution and delivery of this Agreement and the other Transaction Documents to which it is a party and the performance by Buyer of its obligations hereunder and thereunder;

(c)    the Bill of Sale, the Assumption Agreement, the, and each other Transaction Document to which Buyer is a party, duly executed by Buyer;

(d)    the certificates required to be delivered pursuant to Section 9.01 and Section 9.02; and

(e)    such other bills of sale, assignments, deeds, endorsements and other good and sufficient instruments of conveyance, assumption and transfer, in form reasonably satisfactory to Sellers as Seller may reasonably request in order to consummate the transactions contemplated hereby.

18

SECTION 3.03    Closing Deliveries by Sellers.

At or prior to the Closing, Sellers shall deliver or cause to be delivered to Buyer:

(a)    a certificate of an authorized officer of the Seller, dated as of the Closing Date, in form and substance reasonably satisfactory to Buyer, as to a copy of the resolutions of the board of directors of the Seller authorizing and approving its execution and delivery of this Agreement and the other Transaction Documents to which it is a party and the performance by the Seller of its obligations hereunder and thereunder;

(b)    the Bill of Sale, Assumption Agreement, the Transition Services Agreement, and each other Transaction Document (other than the Transaction Documents set forth in Section 3.03(c)) to which each Seller is a party, duly executed by the Sellers party thereto;

(c)    instruments of assignment of the Patents (the "Assignment of Patents"), Trademarks (the "Assignment of Trademarks"), Copyrights (the "Assignment of Copyrights") and Domain Names (the "Assignment of Domain Names") that are owned by the Seller and included in the Acquired Assets, if any, duly executed by the Seller, in form for recordation with the appropriate Governmental Authorities, and any other assignments or instruments with respect to any Transferred Intellectual Property for which an assignment or instrument is required to assign, transfer and convey such assets to Buyer, and which other assignments or instruments shall be in form and substance reasonably acceptable to the Seller and Buyer;

(d)    a certified copy of the Sale Order, as entered by the Bankruptcy Court;

(e)    the certificate required to be delivered pursuant to Section 8.04 hereto;

(f)    certificates executed by the Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that such Seller is not a foreign person within the meaning of Section 1445(f)(3) of the IRC; and

(g)    such other bills of sale, assignments, deeds, endorsements, and other good and sufficient instruments of conveyance, assumption and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request in order to consummate the transactions contemplated hereby.

SECTION 3.04    Further Assurances.

At the Closing, and at all times thereafter as may be necessary, Sellers shall execute and deliver to Buyer such other instruments of transfer as shall be reasonably necessary or appropriate to vest in Buyer good and indefeasible title to the Acquired Assets free and clear of all Encumbrances (other than Permitted Encumbrances) and to comply with the purposes and intent of this Agreement and such other instruments as shall be reasonably necessary or appropriate to evidence the assignment by Sellers and assumption by Buyer of the Assigned Contracts, and each of the parties hereto shall use its reasonable best efforts to take, or cause to

19

be taken, all appropriate action, do or cause to be done all things necessary, proper or advisable under applicable Law, and execute and deliver such documents and other papers, as may be required to consummate the transactions contemplated by this Agreement.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the corresponding sections or subsections of the Seller's Disclosure Schedule or in any update thereto pursuant to Section 7.05 (whether or not the representations and warranties in this Article 4 expressly refer to such schedule), the Seller represents and warrants to Buyer as of the date hereof and as of the Closing Date (except for representations and warranties that are made as of a specific date, which are made only as of such date) as follows:

SECTION 4.01    Organization and Good Standing.

Seller has the full power and authority to own the Assets, and Seller has the full power and authority to carry on the Business. Seller is a corporation duly organized and validly existing under the Laws of the State of Delaware and is authorized to conduct business in the Commonwealth of Massachusetts.

SECTION 4.02    Authority; Validity; Consents.

Subject to entry of the Sale Order by the Bankruptcy Court, Seller has the requisite power, capacity and authority necessary to enter into and deliver and perform its obligations under this Agreement and the other Transaction Documents to which Seller is party and to consummate the transactions contemplated hereby and thereby. Subject to entry of the Sale Order by the Bankruptcy Court, the execution, delivery and performance by Seller of this Agreement and the other Transaction Documents to which Seller is party, the performance of each Seller's obligations hereunder and thereunder and the consummation of the transactions contemplated herein and therein are within Seller's powers and, to the extent Seller is not a natural person, have been duly and validly authorized by all requisite corporate actions in respect thereof and no other corporate proceedings on the part of Seller is necessary to authorize this Agreement or to consummate the transactions contemplated hereby. Subject to entry of the Sale Order by the Bankruptcy Court, this Agreement and the other Transaction Documents to which Seller is party constitute the legal, valid and binding obligations of Seller enforceable against it in accordance with their respective terms. Subject to entry of the Sale Order by the Bankruptcy Court, except as set forth in Section 4.02 of Seller's Disclosure Schedule, Seller is not required to give any notice to, make any filing with or obtain any Consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby or thereby.

SECTION 4.03    Subsidiaries.

(a)         Section 4.03 of Seller's Disclosure Schedule sets forth a complete and accurate list of all Subsidiaries of Seller.

SECTION 4.04    No Conflict.

When the Consents and other actions described in Section 4.02 of the Seller's Disclosure Schedule have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents, the performance by the Seller of their respective obligations hereunder and thereunder, and the consummation of the transactions provided for herein and therein will not (with or without notice, lapse of time or both) result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any termination, cancellation, modification or acceleration of any obligation of, Seller, under any agreement, understanding or Contract to which Seller is bound.

SECTION 4.05    INTENTIONALLY OMITTED.

SECTION 4.06    INTENTIONALLY OMITTED.

SECTION 4.07    Environmental Matters.

Except as set forth in Section 4.06 of Seller's Disclosure Schedule or as would not have a Material Adverse Effect:

(a)         INTENTIONALLY OMITTED;

(b)         Seller has not received written notice from any Governmental Authority alleging that the activities of the Business are in violation of any Laws concerning environmental, health or safety matters ("Environmental, Health and Safety Laws");

(c)         INTENTIONALLY OMITTED;

(d)         there are no claims, suits or Proceedings by any employee pending or, to Seller's Knowledge, threatened, against Seller that are premised on the exposure to asbestos or asbestos-containing material in any of the Real Property;

SECTION 4.08    Title to Acquired Assets.

Seller's have, and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 3.03, and subject to the terms of the Sale Order, the Seller will thereby transfer to Buyer, good and marketable title to, or, in the case of property licensed by the Seller, assign to Buyer a valid licensed interest in, all of the Acquired Assets, free and clear of all Encumbrances, except (a) as set forth in Section 4.08 of the Seller's Disclosure Schedule, (b) for the Assumed Liabilities and (c) for Permitted Encumbrances.

21

SECTION 4.09    INTENTIONALLY OMITTED.

SECTION 4.10    Absence of Certain Developments.

Except as required by Law or GAAP, since December 31, 2014  through and including the date hereof:

(a)      Seller has conducted the Business in the ordinary course of business consistent with the ordinary and customary practices of a company winding down business operations;

(b)      INTENTIONALLY OMITTED; and

(c)      except as set forth on Section 4.10(c) of Seller's Disclosure Schedule, Seller has not taken or authorized any action which, if taken or authorized on or after the date hereof, would require the consent of Buyer.

SECTION 4.11    INTENTIONALLY OMITTED.

SECTION 4.12    Tangible Property and Equipment.

Seller has good and valid record and marketable title to, or a valid leasehold interest in, the tangible property and Equipment constituting a portion of the Acquired Assets and Seller has good and valid record and marketable title to, or a valid leasehold interest in, the tangible property and assets necessary for the conduct of the Business as presently conducted. Except as set forth in Section 4.11 of Seller's Disclosure Schedule, all such tangible property, and Equipment of Seller, and all such tangible property are, to Seller's Knowledge, free from material defects, have been maintained in accordance with normal industry practice, and are in good operating condition and repair, subject to normal wear and tear.

SECTION 4.13    Legal Proceedings.

Except as set forth in Section 4.13 of the Seller's Disclosure Schedule, the Seller nor any of their respective officers, directors, shareholders or employees in their capacity as such, is a party to any Proceeding or, to Seller's Knowledge, has been threatened with, any Proceeding. To Seller's Knowledge, there is no outstanding Order of any Governmental Authority to which the Seller is subject nor is Seller in default with respect to any such Order.

SECTION 4.14    Compliance with Laws; Seller Permits.

(a)      Except as set forth in Section 4.14(a) of the Seller's Disclosure Schedule, to the best of Seller's knowledge the Seller (i) has conducted and continue to conduct the Business in all material respects in accordance with all Laws and Orders applicable to the Business, (ii) are not in violation of any Law or Order applicable to the operation of the Business and (iii) have not received any notice that any violation of any such Law or Order is being or may be alleged.

22

SECTION 4.15   INTENTIONALLY OMITTED.

SECTION 4.16   Intellectual Property.

(a)      Section 4.16(a) of the Seller's Disclosure Schedule sets forth a true, correct and complete list of all U.S. and foreign (i) issued Patents and pending applications for Patents; (ii) registered Trademarks and pending applications for Trademarks; (iii) registered Copyrights and pending applications for Copyrights; and (iv) all Domain Names, in each case which is owned by the Seller and all such Intellectual Property is subsisting and, to Seller's Knowledge, valid and enforceable.

(b)      Section 4.16(b) of the Seller's Disclosure Schedule sets forth a true, correct and complete list of all material licenses, sublicenses or other material Contracts to which Seller is a party or otherwise bound pursuant to which Seller has granted to a third party or has been granted or have obtained by or from a third party any right to use any Intellectual Property that is material to the Business (other than Contracts granting rights to use readily available commercial Software that is generally available on nondiscriminatory pricing terms and having an acquisition price of less than $25,000 in the aggregate for all such related Contracts) (each a "License").  Except as otherwise disclosed in Section 4.16(b) of the Seller's Disclosure Schedule, each License is in full force and effect and is a valid and binding obligation of Seller and, to Seller's Knowledge, the other parties thereto, in accordance with its terms and conditions, except as such enforceability may be limited by bankruptcy, insolvency or other similar Laws affecting the enforcement of creditors' rights generally.  Upon entry of the Sale Order and payment of the applicable Determined Cure Costs, to Seller's Knowledge, (x) neither Seller will be in breach or default of its obligations under any License, (y) no condition exists that with notice or lapse of time or both would constitute a default by Seller under any of the Licenses, and (z) to Seller's Knowledge, no other party to any of the Licenses is in breach or default thereunder.

(c)      Seller owns, or has a valid right to use, free and clear of all Encumbrances (other than Permitted Encumbrances and any Encumbrances arising pursuant to the terms of a License), all Intellectual Property used in the Business and such Intellectual Property constitutes all Intellectual Property necessary to conduct the Business.

(d)      Except as disclosed in Section 4.16(d) of the Seller's Disclosure Schedule, (i) the conduct of the Business by Seller (including the products and services currently sold or provided by the Seller) as currently conducted does not infringe, misappropriate or otherwise violate any Person's Intellectual Property, there has been no such claim or Proceeding asserted or threatened in writing in the past three years against the Seller and, to Seller's Knowledge, there is no valid basis for any such claim, and (ii) to Seller's Knowledge, no Person (including any current or former officer, director, employee or contractor of the Seller, is infringing, misappropriating or otherwise violating any Intellectual Property owned or used by the Seller in the conduct of the Business, and no such claims or Proceedings have been asserted or threatened in writing against any Person by the Seller or, to Seller's Knowledge, any other Person, in the past three years, and to Seller's Knowledge, there is no valid basis for any such claim.

23

(e)        Except as disclosed in Section 4.16(e) of Seller's Disclosure Schedule, Seller has timely made all filings and payments with the appropriate foreign and domestic agencies required to maintain in subsistence all Registered Intellectual Property owned by the Seller. All documentation necessary to confirm and affect Seller's ownership of such Intellectual Property, if acquired from other Persons, has been recorded in the United States Patent and Trademark Office, the United States Copyright Office and the corresponding offices of other Governmental Authorities.

(f)        The Seller has taken commercially reasonable measures to protect the secrecy, confidentiality and value of all Trade Secrets used in the Business (collectively, "Business Trade Secrets"), including, but not limited to, entering into appropriate confidentiality agreements with all officers, directors, employees, and other Persons with access to the Business Trade Secrets. To the Seller's Knowledge, no unauthorized disclosure of any Business Trade Secrets has been made.

(g)        Seller has a policy of requiring all employees, agents, consultants or contractors who have contributed to or participated in the creation, development, improvement, or modification of Intellectual Property to assign all of their rights therein to the Seller. To Seller's Knowledge, no Person has any reasonable basis for claiming any right, title, or interest in and to any such Intellectual Property.

(h)        The IT Systems are adequate in all material respects for their intended use and for the operation of such businesses as are currently operated and as are currently contemplated to be operated by Seller, and are in good working condition (normal wear and tear excepted). There has not been any malfunction with respect to any of the material IT Systems during the last three years that has not been remedied or replaced in all material respects.

(i)        The Data that is used or held for use in the Business by the Seller does not infringe or violate the rights of any Person or otherwise violate any Law.

SECTION 4.17     No Brokers or Finders.

With the exception of the fees which have been previously paid to investment bankers to market the Company prior to the Chapter 11 Case, neither Seller nor any Person acting on the Seller's behalf has paid or become obligated to pay any fee, commission, indemnification or similar payment to any broker, finder, investment banker, agent or intermediary in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable.

SECTION 4.18     INTENTIONALLY OMITTED.

SECTION 4.19     Material Contracts; No Breach of Assigned Contracts.

(a)        Section 4.19(a) of Seller's Disclosure Schedule sets forth a true and complete list of all Material Contracts.

24

(b)        Except as set forth in <u>Section 4.19(b)</u> of Seller's Disclosure Schedule: (i) upon entry of the Sale Order and payment of the Determined Cure Costs each Assigned Contract is valid and binding on Seller and is in full force and effect and enforceable against Seller in accordance with its terms; (ii) Seller has in all material respects performed all obligations required to be performed by it to date under each Assigned Contract; (iii) to Seller's Knowledge, each counterparty to each Assigned Contract has in all material respects performed all obligations required to be performed by it under such Assigned Contract; (iv) Seller does not have any knowledge of, and has not received written notice of, the existence of any event or condition which constitutes, or, after notice or lapse of time or both, will constitute, a material breach or violation of or material default on the part of Seller or its counterparties under any such Assigned Contract; and (v) prior to the date of this Agreement, true and correct copies of all Material Contracts (including all amendments and modifications thereto) in effect on the date hereof have been made available to Buyer.

SECTION 4.20    Insurance.

Each insurance policy and insurance arrangement that covers the Acquired Assets, the Assumed Liabilities, and the Business (the "<u>Insurance Policies</u>") are in full force and effect, all premiums thereon have been paid, and, to the Knowledge of the Seller are otherwise in compliance in all material respects with the terms and provisions of such policies. To the Knowledge of the Seller: (i) there is no pending notice of cancellation or non-renewal of any such Insurance Policies, (ii) the termination of any such Insurance Policies has not been threatened, and (iii) no event, condition or act (including the purchase of the Acquired Assets hereunder) has occurred and is continuing or been taken that, with the giving of notice, the lapse of time or the happening of any other event or condition, would entitle any insurer to terminate or cancel any such Insurance Policies.

### ARTICLE 5
### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers as of the date hereof and as of the Closing Date (except for representations and warranties that are made as of a specific date, which are made only as of such date) as follows:

SECTION 5.01    Organization and Good Standing.

Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware. Buyer has the full power and authority to own its property, carry on its business as now being conducted and as proposed to be conducted following the Closing, and to carry out the transactions contemplated hereby.

SECTION 5.02    Authority; Validity; Consents.

Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery

25

and performance by Buyer of this Agreement and the other Transaction Documents to which Buyer is party and the consummation of the transactions contemplated herein and therein have been duly and validly authorized by all necessary corporate actions in respect thereof. This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligations of Buyer, enforceable against it in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Buyer is not required to give any notice to, make any filing with or obtain any Consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby or thereby.

SECTION 5.03    No Conflict.

The execution and delivery of this Agreement and the other Transaction Documents, the performance by the Buyer of its respective obligations hereunder and thereunder, and the consummation of the transactions provided for herein and therein will not (with or without notice, lapse of time or both) result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any termination, cancellation, modification or acceleration of any obligation of, the Buyer, result in a loss of any benefit to which the Buyer is entitled to, or result in the creation of any material Encumbrance upon any assets or properties of the Buyer, under (a) any agreement, understanding or Contract, to which any of the Buyer or any of its properties or assets is bound, (b) the certificates of formation or incorporation, bylaws or other organizational or governing documents Buyer, (c) any Order, or (d) any Seller Permit or Law; in the case of the preceding clauses (a), (c) and (d), except for such breaches, defaults, conflicts or accelerations that do not, and are not reasonably likely to, individually or in the aggregate, materially and adversely affect the ability of Buyer to carry out its obligations under this Agreement and the other Transaction Documents to which it is a party, and to consummate the transactions contemplated hereby.

SECTION 5.04    No Brokers or Finders.

Neither Buyer nor any Person acting on its behalf has paid or become obligated to pay any fee, commission, indemnification or similar payment to any broker, finder, investment banker, agent or intermediary in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which any Seller is or will become liable, and Buyer shall indemnify and hold harmless Sellers from any claims with respect to any such fees, commissions or similar payments.

SECTION 5.05    Buyer's Acknowledgment.

Buyer is not aware of any facts or circumstance, which (with or without notice or lapse of time or both) would cause any representations or warranties of any Seller to be untrue or incorrect in any respect. However, Buyer intends to rely on the Bankruptcy schedules of Seller as being true and accurate concerning the assets of the Seller.

26

SECTION 5.06    Acquired Assets "AS IS"; Buyer's Acknowledgment Regarding Same.

Buyer agrees, warrants, and represents that, except as set forth in this Agreement, (a) Buyer is purchasing the Acquired Assets on an "AS IS" and "WITH ALL FAULTS" basis based solely on Buyer's own investigation of the Acquired Assets and (b) neither the Seller nor any real estate broker, agent, officer, employee, servant, attorney, or representative of any Seller has made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Acquired Assets or the Assumed Liabilities, any part of the Acquired Assets or the Assumed Liabilities, relating to the financial performance of the Acquired Assets or the Business, or the physical condition of the Acquired Assets. Buyer further acknowledges that the consideration for the Acquired Assets specified in this Agreement has been agreed upon by Seller and Buyer after good-faith arms-length negotiation in light of Buyer's agreement to purchase the Acquired Assets "AS IS" and "WITH ALL FAULTS". Buyer confirms that Seller has made available to Buyer the opportunity to ask questions of the officers and management of the Seller and to acquire additional information about the Business, the Acquired Assets and the Assumed Liabilities. Buyer agrees, warrants, and represents that, except as set forth in this Agreement, Buyer has relied, and shall rely, solely upon Buyer's own investigation of all such matters, and that Buyer assumes all risks with respect thereto. EXCEPT AS SET FORTH IN THIS AGREEMENT, SELLER DOES NOT MAKE ANY EXPRESS WARRANTY, ANY WARRANTY OF MERCHANTABILITY, ANY WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, OR ANY IMPLIED OR STATUTORY WARRANTY WHATSOEVER WITH RESPECT TO ANY REAL OR PERSONAL PROPERTY OR ANY FIXTURES OR THE ACQUIRED ASSETS, OR THE BUSINESS.

## ARTICLE 6
## BANKRUPTCY COURT MATTERS

SECTION 6.01    Bankruptcy Court Approval.

(a)    Seller and Buyer acknowledge that this Agreement and the sale by Seller of the Seller Acquired Assets (including the assumption and assignment of the Assigned Contracts) are subject to Bankruptcy Court approval after commencement of Seller's Chapter 11 Case. Seller and Buyer further acknowledge that Seller must take reasonable steps to demonstrate that it has sought to obtain the highest or best price for the Acquired Assets, including giving notice thereof to Seller's creditors and other interested parties, providing information about the Acquired Assets to prospective bidders (subject to appropriate non-disclosure agreements to protect the Seller's intellectual property and business secrets), entertaining higher or better qualified offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an auction, all in accordance with the Bid Procedures Order.

(b)    In furtherance of the foregoing, Seller shall use reasonable efforts (including the filing of the necessary motions) to obtain entry by the Bankruptcy Court of (i) the Bid Procedures Order (including approval of the Break-up Fee and Expense Reimbursement as set forth in the Bid Procedures Motion within 20 calendar days after the Petition Date, and (ii) the Sale Order by October 16, 2015.

27

(c)    In the event that the Bid Procedures Order and Sale Order are entered by the Bankruptcy Court, and an appeal is taken or a stay pending appeal is requested from either such Orders, Seller shall immediately notify Buyer of such appeal or stay request, and shall promptly provide to Buyer a copy of the related notice of appeal or Order of stay. Seller shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such Orders. From and after the date hereof until the Closing Date, Seller shall not take any action which is intended to result in, or fail to take any action the intent of which failure to act would result in the delay, reversal, voiding, modification or staying of the Bid Procedures Order or Sale Order.

SECTION 6.02    Bankruptcy Court Filings.

From and after the date hereof until the Closing Date, Seller shall deliver to Buyer copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers that are filed in the Chapter 11 Case one (1) business day prior to their filing,.

SECTION 6.03    INTENTIONALLY OMITTED.

SECTION 6.04    Assumption and Assignment of Assigned Contracts.

(a)    On the Closing Date, pursuant to the Sale Order and/or the consent of the applicable counterparties to the respective executory contract, Seller shall assume and assign to Buyer the Assigned Contracts.

(b)    Notwithstanding any provision in this Agreement to the contrary, from and after the date hereof through the Closing Date, the Seller will not reject or take any action to reject, repudiate or disclaim (or fail to take any action that would result in rejection, repudiation or disclaimer by operation of law of), any Contract without the prior written consent of Buyer which consent will not be unreasonably withheld, delayed or conditioned. Further, Seller shall file in the Chapter 11 Case such motions or pleadings as may be appropriate and necessary to preserve Seller's right or ability to assume and assign any of the Assigned Contracts.

(c)    To the extent that any Assigned Contract to be sold, transferred, conveyed or assigned (any sale, transfer, conveyance or assignment, a "Transfer") to Buyer pursuant to the terms of Section 2.01 is not capable of being so Transferred to Buyer (after giving effect to the Sale Order) without the Consent of a third Person (each such Contract, a "Consent Pending Contract"), or if such Transfer or attempted Transfer, or the subsequent Transfer or attempted Transfer of the equity interests of Buyer would, constitute a breach thereof or a violation of any Law or Order, nothing in this Agreement or in any document, agreement or instrument delivered pursuant to this Agreement will constitute a Transfer or an attempted Transfer thereof prior to the time at which all Consents necessary for such Transfer have been obtained unless an Order of the Bankruptcy Court effects such Transfer without such Consent.

(d)    Buyer shall provide Seller with adequate assurance of Buyer's payment obligations under Section 6.04(b) including through cash payments to Assigned

28

Contract counterparties. Any dispute concerning requested adequate assurance shall be addressed to and resolved by the Bankruptcy Court.

SECTION 6.05   Determined Cure Costs.

(a)   Seller shall use reasonable best efforts, including the filing and prosecution of any and all appropriate proceedings in the Bankruptcy Court, to establish the Estimated Cure Cost for each Assigned Contract as the Determined Cure Cost for such Assigned Contract.

(b)   By not later than five calendar days before the Sale Hearing, Seller shall make available, or cause to be made available, to Buyer (i) true and complete copies of the Assigned Contracts, or in the case of oral Assigned Contracts, true and complete written descriptions thereof (in each case including all amendments thereto and assignments thereof), and (ii) a schedule of Seller's good faith estimate of the Cure Costs (as the same may be updated, supplemented or amended, the "Estimated Cure Costs"), if any, associated with each Assigned Contract.

(c)   On the Closing Date, or as soon as reasonably practicable thereafter, in connection with the assumption by Seller, and assignment to Buyer, of the Assigned Contracts, Buyer shall make provision for the payment of the Determined Cure Costs in accordance with a Final Order of the Bankruptcy Court providing for such Determined Cure Costs (which may be the Sale Order); provided, however, that, notwithstanding anything to the contrary herein (including the deadline applicable to and set forth in the lead-in to Section 2.02(b)(i)), if the Determined Cure Cost for any Contract that, at the time, is an Assigned Contract, respectively, exceeds the Estimated Cure Cost in respect of such Contract, then Buyer, in its sole discretion, may (on notice to Seller and the applicable counterparty) elect to amend Section 1.01 of Seller's Disclosure Schedule, as applicable, so as to exclude such Contract, whereupon such Contract so excluded shall not constitute an "Assigned Contract" (and shall therefore constitute an "Excluded Asset"), and Buyer shall not acquire any rights, or assume any Liabilities, with respect to such Contract so excluded. Buyer shall not be liable for Determined Cure Costs related to any Contract excluded from Section 1.01 of Seller's Disclosure Schedule, as applicable, in accordance with either this Section 6.05(c) or Section 2.02(b)(i)), except that Buyer shall be liable for Determined Cure Costs (or portions thereof) to the extent provided by Section 6.04(d).

## ARTICLE 7
## ADDITIONAL AGREEMENTS

SECTION 7.01   Investigation of the Business By Buyer Prior to Closing.

(a)   From and after the date hereof until the Closing, and subject to the confidentiality obligations to which Seller and Buyer may be bound, Seller shall upon reasonable advance notice afford Buyer's Representatives reasonable access during normal business hours to Seller's offices and key employees.

SECTION 7.02    Conduct of Business Prior to the Closing Date.

Between the date hereof and the Closing, Seller shall, use its reasonable best efforts to maintain, or cause the maintenance of, the Acquired Assets and Business, and operate and carry on the Business only in the ordinary course consistent with the winding down of the Business and taking into account Seller's status as debtor and debtor in possession except as otherwise expressly provided in this Agreement.

SECTION 7.03    Third Party Consents.

Subject to Section 6.04(c) and Section 6.04(d), from and after the date hereof until the Closing, Seller, on the one hand, and Buyer, on the other hand, will use their reasonable best efforts to cooperate with the other to secure, before the Closing Date, all Third Party Consents to the extent such Third Party Consents are not provided for or satisfied by the Sale Order; provided, however, that neither Buyer nor Seller shall be required to waive any of the conditions to Closing set forth in Article 8 or Article 9, respectively.

SECTION 7.04    Reasonable Best Efforts.

(a)        From and after the date hereof until the Closing Date, Seller and Buyer shall use their respective reasonable best efforts to cooperate with each other, to do or cause to be done, all things necessary, proper or advisable consistent with applicable Laws and Orders to cause the conditions precedent to the Closing to be satisfied and to cause the Closing to occur.

SECTION 7.05    Seller's Disclosure Schedule.

(a)        The parties hereto acknowledge and agree that (i) Seller's Disclosure Schedule delivered to Buyer on the date hereof and attached hereto as Exhibit B is in draft form only, and (ii) from and after the date hereof, the parties hereto shall use their commercially reasonable efforts to cooperate to negotiate and finalize Seller's Disclosure Schedule.

SECTION 7.06    Notice of Developments.

From and after the date hereof until the Closing, Seller shall promptly notify Buyer of (a) any change or development which would cause any of the representations and warranties in Article 4 above not to be true and correct in all material respects, or (b) any material failure of Sellers to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it under this Agreement.

SECTION 7.07    Taxes.

(a)        Except as specifically set forth in this Section 7.07 (including Section 7.07(b)), Seller shall be liable for and shall pay, and pursuant to Section 7.07(c) shall reimburse Buyer for, all Taxes (whether assessed or unassessed) applicable to the Business and the Acquired Assets, in each case attributable to periods (or portions thereof) ending on or prior to the Closing Date.  Without limiting the obligations of Buyer contained elsewhere in this Agreement (including Section 7.07(b)), Buyer shall be liable for and shall pay, and pursuant to

Section 7.07(c) shall reimburse the applicable Seller for, all Taxes (whether assessed or unassessed) applicable to the Business, the Acquired Assets and the Assumed Liabilities, in each case attributable to periods (or portions thereof) beginning after the Closing Date. For purposes of this Section 7.07(a), any period beginning before and ending after the Closing Date shall be treated as two partial periods, one ending on the Closing Date and the other beginning on the day after the Closing Date except that Taxes (such as property Taxes) imposed on a periodic basis shall be allocated on a daily basis.

(b)    Without limiting the other terms set forth in this Agreement, any sales Tax, use Tax, real property transfer or gains Tax, documentary stamp Tax or similar Tax attributable to the sale or transfer of the Acquired Assets and not exempted under the Sale Order or by Section 1146(a) of the Bankruptcy Code ("Transfer Taxes") shall be borne by Buyer. Sellers and Buyer shall use their respective reasonable best efforts and cooperate in good faith to exempt the sale and transfer of the Acquired Assets from any such Transfer Taxes. Buyer shall prepare and file all necessary Tax Returns or other documents with respect to all such Transfer Taxes; provided, however, that in the event any such Tax Return requires execution by Seller, Buyer shall prepare and deliver to Sellers a copy of such Tax Return at least ten days before the due date thereof, and Sellers shall promptly execute such Tax Return and deliver it to Buyer, which shall cause it to be filed.

(c)    Seller or Buyer, as the case may be, shall provide reimbursement for any Tax paid by one party all or a portion of which is the responsibility of the other party in accordance with the terms of this Section 7.01. Within a reasonable time prior to the payment of any such Tax, the party paying such Tax shall give notice to the other of the Tax payable and each party's respective Liability therefor, although failure to do so will not relieve the other party from its Liability hereunder.

SECTION 7.08    Employee Matters.

Nothing contained in this Agreement shall be construed to require the employment of (or prevent the termination of employment of) any individual, require minimum benefit or compensation levels or prevent any change in the employee benefits provided to any employee of the Seller. No provision of this Agreement shall create any third party beneficiary rights in any employee or former employee of the Seller or any other Person (including any beneficiary or dependent thereof) of any nature or kind whatsoever, including without limitation, in respect of continued employment (or resumed employment) for any specified period.

## ARTICLE 8
## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived by the Buyer:

SECTION 8.01    INTENTIONALLY OMITTED.

SECTION 8.02    INTENTIONALLY OMITTED.

SECTION 8.03    Accuracy of Representations

All of the representations and warranties made by Seller in this Agreement shall be true and correct in all material respects (other than those representations and warranties that are qualified by materiality or Material Adverse Effect, which shall be true and correct in all respects) as of the date hereof and as of the Closing Date as though made at and as of the Closing Date (except to the extent such representations and warranties expressly speak as of an earlier date, which shall be true and correct as of such date); provided, however, that in the event of a breach of a representation or warranty, other than a representation or warranty qualified by a Material Adverse Effect, the condition set forth in this Section 8.03 shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together result in a Material Adverse Effect.  Buyer shall have received a certificate signed by a duly authorized representative of  the Seller to such effect.

SECTION 8.04    Seller's Performance

Seller shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be performed by the Seller on or prior to the Closing Date, and Buyer shall have received a certificate signed by a duly authorized representative of the Seller to such effect.

SECTION 8.05    No Order

No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Order or Law which is in effect and has the effect of making illegal or otherwise restraining or prohibiting the consummation of the transactions contemplated by this Agreement.

SECTION 8.06    No Proceedings.

There shall not be pending or threatened by any Governmental Authority any Proceeding challenging or seeking to enjoin or otherwise prohibit any of the transactions contemplated by this Agreement or seeking to obtain from Buyer in connection with the transactions contemplated by this Agreement any damages or to impose any restrictions or conditions.

SECTION 8.07    Consents and Approvals.

All Consents of any Person (including any Governmental Authority) which are necessary to consummate the transactions contemplated hereby as set forth on Section 8.07 of the Seller's Disclosure Schedule shall have been filed, been obtained or occurred and such Consents shall not have expired or been withdrawn.

32

SECTION 8.08    Seller's Deliveries.

Each of the deliveries required to be made to Buyer pursuant to Section 3.03 shall have been so delivered.

SECTION 8.09    Sale Order.

The Bankruptcy Court shall have issued the Sale Order which Sale Order shall have become a Final Order by not later than the Outside Date.

SECTION 8.10    Delivery of Final Seller's Disclosure Schedule.

At least 10 Business Days prior to Closing, the Sellers shall deliver, or cause to be delivered, to the Buyer the final Seller's Disclosure Schedule.

SECTION 8.11    Preclosing Satisfaction of Conditions.

The conditions set forth in Sections 8.03 through 8.07 shall be deemed to have been satisfied as of the Closing unless (i) Buyer provides written notice to Seller in the manner provided for in Section 11.04, such notice to be received by Seller on or before 5:00 p.m. on the last business day prior to the deadline established by the Bankruptcy Court pursuant to the Bid Procedures Order for the submission of competing bids to purchase the Assets (the "Conditions Deadline"), that any such condition has not been satisfied, which notice shall set forth in reasonable detail the facts precluding satisfaction of such condition, and (ii) as to any such condition for which such notice is not provided, there has not, during the period from the Conditions Deadline to the Closing, occurred or first come to Buyer's attention an event that, had it occurred or been known to Buyer prior to the Conditions Deadline, would have precluded the satisfaction of such condition.

## ARTICLE 9
## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligations of the Seller to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived the Seller:

SECTION 9.01    Accuracy of Representations.

All of the representations and warranties made by Buyer in this Agreement shall be true and correct in all material respects (other than those representations and warranties that are qualified by materiality, which shall be true and correct in all respects) as of the date hereof and as of the Closing Date as though made at and as of the Closing Date (except to the extent such representations and warranties expressly speak as of an earlier date, which shall be true and correct as of such date).  Sellers shall have received a certificate signed by a duly authorized representative of Buyer to such effect.

33

SECTION 9.02    Buyer's Performance.

Buyer shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be performed by Buyer on or prior to the Closing Date, and Seller shall have received a certificate signed by a duly authorized representative of Buyer to such effect.

SECTION 9.03    No Order.

No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Order or Law which is in effect and has the effect of making illegal or otherwise restraining or prohibiting the consummation of the transactions contemplated by this Agreement.

SECTION 9.04    No Proceedings.

There shall not be pending or threatened by any Governmental Authority any Proceeding challenging or seeking to enjoin or otherwise prohibit any of the transactions contemplated by this Agreement or seeking to obtain from Buyer in connection with the transactions contemplated by this Agreement any damages or to impose any restrictions or conditions.

SECTION 9.05    Consents and Approvals.

All Consents from any Person (including any Governmental Authority) which are necessary to consummate the transactions contemplated hereby shall have been filed, been obtained or occurred and such Consents shall not have expired or been withdrawn.

SECTION 9.06    Buyer's Deliveries.

Each of the deliveries required to be made to Sellers pursuant to Section 3.02 shall have been so delivered.

SECTION 9.07    Sale Order.

The Bankruptcy Court shall have issued the Sale Order which Sale Order shall have become a Final Order by not later than the Outside Date.

SECTION 9.08    Payment of Purchase Price.

Buyer shall have paid the Purchase Price in accordance with Section 3.02(a).

## ARTICLE 10
## TERMINATION

SECTION 10.01   Termination.

Notwithstanding anything contained to the contrary in this Agreement, this Agreement may be terminated at any time prior to the Closing Date:

(a)      by either the Seller or the Buyer:

(i)      if a Governmental Authority of competent jurisdiction issues a final non-appealable ruling or Order that permanently enjoins or otherwise prohibits the transactions contemplated hereby; or

(ii)      upon mutual written consent of Sellers and Buyer.

(b)      by Buyer:

(i)      if the Closing Date shall not have occurred by the Outside Date; provided, however, that the right to terminate this Agreement under this Section 10.01(b)(i) shall not be available to Buyer if Buyer's failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to have occurred on or prior to such date;

(ii)      in the event of any material breach by Seller of any of Seller's agreements, covenants, representations or warranties contained herein, or of the Bid Procedures Order or the Sale Order, and the failure of Sellers to cure such breach within seven days after receipt of the Buyer Termination Notice specified in this subsection; provided, however, that Buyer (i) is not itself in material breach of its representations, warranties, covenants or agreements contained herein or in the Bid Procedures Order or the Sale Order, (ii) notifies Sellers in writing (the "Buyer Termination Notice") of its intention to exercise its rights under this Agreement as a result of the breach, and (iii) specifies in such Buyer Termination Notice the representation, warranty, covenant or agreement contained herein or in the Bid Procedures Order or the Sale Order of which Sellers are allegedly in material breach;

(iii)      if (A) the Bankruptcy Court fails to enter the Bid Procedures Order on or before the date that is 30 days following the Petition Date, (B) Sellers fail to hold an auction pursuant to the Bid Procedures Order on or before November 16, 2015, (C) the Bankruptcy Court fails to enter an Order designating Buyer as the successful bidder or the successful back-up bidder on or before November 20, 2015, (D) the Bankruptcy Court fails have issued the Sale Order or the Sale Order has not become a Final Order by on or prior to the Outside Date;

(iv)      if the Chapter 11 Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion

expressly contemplates the transactions provided for in this Agreement, or a trustee is appointed for Sellers and such trustee rejects the transactions contemplated by this Agreement;

(v)     Buyer is not the successful bidder in the auction pursuant to the Bid Procedures or the Bankruptcy Court enters an Order authorizing the Sellers or any of their Affiliates to enter into any Contract with respect to or consummate a transaction with an Alternative Buyer;

(vi)     the Bid Procedures Order or the Sale Order has been stayed, modified, amended, supplemented, reversed, vacated or otherwise rendered ineffective by any court of competent jurisdiction without Buyer's prior written consent or otherwise fails to be in full force and effect; or

(c)     by Seller, in the event of any material breach by Buyer of any of Buyer's agreements, covenants, representations or warranties contained herein, or of the Bid Procedures Order or the Sale Order, and the failure of the Buyer to cure such breach within seven days after receipt of the Seller Termination Notice specified in this subsection; provided, however, that (i) Seller is not itself in material breach of its representations, warranties, covenants or agreements contained herein or in the Bid Procedures Order or the Sale Order, (ii) Seller notifies Buyer in writing (the "Seller's Termination Notice"), and (iii) Seller specifies in such Seller's Termination Notice the representation, warranty, covenant or agreement contained herein or in the Bid Procedures Order or the Sale Order of which Buyer is allegedly in material breach.

SECTION 10.02   Effect of Termination.  In the event of termination of this Agreement by either party in accordance with Section 10.01 hereof, all rights and obligations of the parties under this Agreement shall terminate without any Liability of any party to any other party; provided, however, that the provisions of Section 6.03 and Article 11 (except Section 11.01) shall expressly survive the expiration or termination of this Agreement.

## ARTICLE 11
## GENERAL PROVISIONS

SECTION 11.01   Survival of Representations, Warranties and Covenants.

All representations and warranties herein shall terminate on the Closing Date. The covenants and agreements contained herein that are required to be performed on or prior to the Closing Date shall terminate on the Closing Date and the covenants that require performance after the Closing Date shall survive in accordance with the terms thereof.

SECTION 11.02   Confidential Nature of Obligations.

Subject to any disclosure requirements under the Bankruptcy Code or imposed by the Bankruptcy Court, Buyer and Seller each agree that it will treat in confidence all documents, materials and other information which it shall have obtained regarding the other party during the course of the negotiations leading to the consummation of the transactions contemplated hereby

(whether obtained before or after the date of this Agreement), the investigation provided for herein and the preparation of this Agreement and other related documents, and, in the event the transactions contemplated hereby shall not be consummated, at the request of the disclosing party, will return to the other party all copies of nonpublic documents and materials which have been furnished in connection therewith. Such non-public documents, materials and information shall not be communicated to any third Person (other than to Buyer's and Seller's counsel, accountants or financial advisors, in each case subject to the recipient's agreement to keep the same confidential). No other party shall use any confidential information in any manner whatsoever except solely for the purpose of evaluating the proposed purchase and sale of the Acquired Assets; provided, however, that after the Closing, any confidential information included in the Acquired Assets or the Assumed Liabilities shall be deemed the confidential information of Buyer, and the Seller shall maintain the confidentiality thereof in accordance with this Section 11.02. The obligation of each party to treat such documents, materials and other information in confidence shall not apply to any information which (i) is or becomes available to such party from a source other than the disclosing party, (ii) is or becomes available to the public other than as a result of disclosure by such party or its agents or (iii) is required to be disclosed under applicable Law (including under the Bankruptcy Code or as required by the Bankruptcy Court), but only to the extent it must be disclosed. Notwithstanding clause (iii) of the preceding sentence, in the event that any party is required to disclose any confidential information by applicable Law or rule of any national securities exchange, it is agreed that the party subject to such requirement will provide the other party with prompt notice of such requirement and such party may seek an appropriate protective order if it so desires.

SECTION 11.03 Public Announcements.

Unless otherwise required by applicable Law or by obligations of the parties hereto or any of their Affiliates pursuant to any listing agreement with or rules of any securities exchange, the parties hereto shall consult with each other before issuing any other press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other party and shall not issue any such release or make any such statement without the prior written consent of the other party (such consent not to be unreasonably withheld or delayed).

SECTION 11.04 Notices.

All notices, consents, waivers and other communications under this Agreement must be in writing and shall be deemed to have been duly given: (a) on the same Business Day if sent by email followed by facsimile (with written confirmation of receipt), (b) when delivered by hand (with written confirmation of receipt) to the addresses set forth above, (c) when received by the addressee, if sent by a delivery service (prepaid, receipt requested) or (d) when received by the addressee, if sent by registered or certified mail (postage prepaid, return receipt requested), in each case to the appropriate addresses, representative (if applicable) and facsimile numbers set forth below (or to such other addresses, representative and facsimile numbers as a party may designate by notice to the other parties given in accordance with this Section 11.04):

SECTION 11.05   Waiver.

Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power, or privilege shall preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege.  To the maximum extent permitted by applicable Law, (a) no waiver that may be given by a party shall be applicable except in the specific instance for which it is given; and (b) no notice to or demand on one party shall be deemed to be a waiver of any right of the party giving such notice or demand to take further action without notice or demand.

SECTION 11.06   Entire Agreement; Amendment.

This Agreement (including the disclosure schedules and the exhibits hereto) and the other Transaction Documents supersede all prior agreements (other than the Confidentiality Agreement, which shall remain in full force and effect) between the parties with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between the parties with respect to their subject matter (other than the Confidentiality Agreement, which shall remain in full force and effect).  This Agreement may not be amended except by a written agreement executed by the parties.

SECTION 11.07   Assignment.

This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any party hereto by operation of law or otherwise without the express written consent of the other parties (which consent may be granted or withheld in the sole discretion of such other party); provided, however, that, prior to Closing, Buyer shall be permitted, to assign all or part of its rights or obligations hereunder to a related party, whereupon, references to "Buyer" herein shall be deemed to refer to such related party; provided further that any such assignment shall not relieve Buyer of any of its financial obligations to Sellers hereunder and that any assignee must also be a qualified bidder as set forth in the Bidding Procedures Order.

SECTION 11.08   Severability.

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party in any material respect.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

SECTION 11.09   Section Headings, Construction.

The headings of Sections in this Agreement are provided for convenience only and shall not affect its construction or interpretation. All references to "Article," "Section" or "Sections" refer to the corresponding Article, Section or Sections of this Agreement. All words used in this Agreement shall be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms. The Exhibits attached hereto and the Schedules attached hereto (including the Seller's Disclosure Schedule) are hereby incorporated herein and made a part hereof as if fully set forth herein.

SECTION 11.10   Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)      This Agreement shall be governed by, and construed in accordance with, the Laws of the State of New York applicable to Contracts executed in and to be performed in that State, and, to the extent applicable, the Bankruptcy Code.

(b)      The parties agree that the Bankruptcy Court shall be the exclusive forum for enforcement of this Agreement or the transactions contemplated hereby and (only for the limited purpose of such enforcement) submit to the jurisdiction thereof; *provided* that if the Bankruptcy Court determines that it does not have subject matter jurisdiction over any action or proceeding arising out of or relating to this Agreement, then each party: (i) agrees that all such actions or proceedings shall be heard and determined in a Massachusetts federal court sitting in The City of Boston; (ii) irrevocably submits to the jurisdiction of such court in any such action or proceeding; (iii) consents that any such action or proceeding may be brought in such courts and waives any objection that such party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court; and (iv) agrees that service of process in any such action or proceeding may be effected by providing a copy thereof by any of the methods of delivery permitted by Section 11.04 to such party at its address as provided in Section 11.04 (provided that nothing herein shall affect the right to effect service of process in any other manner permitted by Law).

(c)      EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH OF THE PARTIES HERETO HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.10(C).

SECTION 11.11 Counterparts.

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original of this Agreement and all of which, when taken together, shall be deemed to constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or email attachment shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 11.12   Time of Essence.

Time is of the essence with respect to the performance of each parties obligations hereunder.

SECTION 11.13   No Third Party Beneficiaries.

This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

SECTION 11.14   Expenses.

Except as otherwise specified in this Agreement, all costs and expenses, including fees and disbursements of counsel, financial advisors, accountants and other advisors, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, subject to any requested and required Bankruptcy Court approval, whether or not the Closing shall have occurred.  Nothing in this Agreement shall preclude Buyer from including, to the extent permitted by governing loan documents and Section 506(d) of the Bankruptcy Code, Buyer's costs and expenses as part of Buyer's secured claim asserted against Seller and its bankruptcy estate.

*[Remainder of page intentionally left blank; signature pages follow]*

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the year and date first above written.

Cambridge Endoscopic Devices Inc.,

By: _____

Name: Woojin Lee

Title: President

White Sand Beach LLC

By: _____

Name: Douglas Wall

Title: Manager

41

IN WITNESS WHEREOF, the parties have executed this Agreement as of the year and date first above written.

Cambridge Endoscopic Devices Inc.,

By: _____

Name:

Title: President

White Sand Beach LLC

By: _____

Name: Douglas Wall

Title: Manager

13

**Exhibit A**

Secured Lenders

| Names | Principal |
|---|---|
| White Sands Beach | $2,500,000 |
| AHIMSTER Associates | $20,000 |
| Saul and Elaine Schreiber Family Trust | $50,000 |
| Michael Rubin | $3,000 |
| David and Helen Kaplan JTWROS | $25,000 |
| D. Kaplan LTD partnership | $25,000 |
| Michael Simons | $50,000 |
| Paul Mraz | $250,000 |
| **Total** | **$2,923,000** |

**Exhibit B**

Seller's Disclosure Schedule

Schedule 1.01: Assigned Contracts:    None

Schedule 1.01(c): Other Permitted Encumbrances:   None

Schedule 1.01(d): Seller's Knowledge Parties:     John Schulte; Woojin Lee

Schedule 1.01(e): Third Party Consents:      None

Schedule 2.03(c): Other Assumed Liabilities:      None

Schedule 4.02: Other Required Consents:     None

Schedule 4.03: Subsidiaries:  None

Schedule 4.07: Environmental Matters:      None

Schedule 4.08: Other Permitted Encumbrances [Post-Closing]:      None

Schedule 4.10(c): Actions Taken since December 31, 2014:       None

Schedule 4.12: Tangible Property and Equipment:   None

Schedule 4.13: Legal Proceedings:    None

Schedule 4.14(a): Compliance with Laws:    None

Schedule 4.16(a):  Intellectual Property

      i) Patents:     see attached "Intellectual Property Status List"

      ii) Trademarks:     see attached "Intellectual Property Status List"

      (iii) Registered Copyrights:    None

      (iv) Domain Names:  cambridgeendo.com

Schedule 4.16(b):  Material Intellectual Property Licenses/Contracts:      see Schedule 4.19

Schedule 4.16(d):  Infringement Claims:     None

Schedule 4.16(e):  Maintenance of Registered IP:  see attached "Intellectual Property Status List"

Schedule 4.19(a):  Material Contracts:

> Co-Development and Cross-License Agreement dated December 21, 2009 by and between Seller and Microline Surgical, Inc.

> Agreement Regarding Development of Handheld Robotic Smart Instrument for Advanced Minimally Invasive Surgery, covering periods commencing May 1, 2009, by and between Seller and Rebo Co., Ltd. ("Rebo Agreement")

Schedule 4.19(b):  Performance of Material Contracts:

> Rebo (n/k/a Meere) paid Seller's portion of the royalty due the Korean government under the Rebo Agreement, so Seller owes approximately $80,000 to Rebo/Meere in reimbursement.

**CAMBRIDGE ENDOSCOPIC DEVICES**
**INTELLECTUAL PROPERTY STATUS LIST**
**July 31, 2015**

| File Number | Title | Patent Office Info | Publication No. | Description of Property | Status Due Dates |
|---|---|---|---|---|---|
| CE-1001P | Surgical Instrument | 60/515,560 10-30-03 | | Original Instrument | Converted to Utility 04-12-2004 |
| CE- 1001U | Surgical Instrument | 10/822,081 4-12-04 | | Original Instrument **Category A** | **USP 7,147,650** Issued 12-12-06 **M-fee due by 06-12-2018** |
| CE-1001C1 | Surgical Instrument | 11/429,796 5-8-06 | | Original Instrument - Continuation | **USP 7,364,582** Issued 4-29-08 **M-fee due by 10-29-2015** |
| CE-1001C2 | Surgical Instrument | 11/786,412 04-11-07 | 2007/0244358 10-18-2007 | Second continuation to cover additional features relating to electro-mechanical | **Abandoned** |
| CE-1001C3 | Surgical Instrument | 12/154,761 5-27-08 | 2008/0262492 10-23-2008 | | **Abandoned** |
| CE-1001PCT | Surgical Instrument | PCT/US 2004/33881 10-15-04 | | Original description of instrument | Application Converted AU, CA, JP, EP |
| CE-1001AU Australia | Surgical Instrument | 2004287388 10-15-2004 | | Original description of instrument | **Patent No. 2004287388 Abandoned** |
| CE-1001AU Div Australia | Surgical Instrument | 2010214687 08-27-2010 | | | **Abandoned** |
| CE-1001CA Canada | Surgical Instrument | 2,543,105 10-15-2004 | | Original description of instrument | **Abandoned** |
| CE-1001JP Japan | Surgical Instrument | 2006-538055 10-15-2004 | | Original description of instrument | Patent No. 4,912,150 Issued 01-27-2012 **Abandoned** |
| CE-1001EP Europe | Surgical Instrument | 04795090.2 10-15-2004 | | Original description of instrument | **Abandoned** |
| CE-1002P | Surgical Instrument | 60/671,189 4-14-05 | | More detailed description of instrument | Converted to Utility 07-20-2005 |
| CE-1002U | Surgical Instrument | 11/185,911 7-20-05 | 2006/0020287 01-26-2006 | More detailed description of instrument Foreign Coverage  in | **USP 7,686,826 Issued 03-30-2010 M-fee due by 09-30-2017** |

| File Number | Title | Patent Office Info | Publication No. | Description of Property | Status Due Dates |
|---|---|---|---|---|---|
| | | | | CE-1004PCT **Category A** | |
| CE-1002Con | Surgical Instrument | 12/660,979 03-09-2010 | 2010/0191278 07-29-2010 | | **Abandon** |
| CE-1003P | Guide Device | 60/700,776 7-20-05 | | Bendable guide device | Converted to Utility 10-03-05 |
| CE-1003U | Guide Device | 11/242,642 10-3-05 | 2007/0021737 01-25-2007 | Bendable sections applied to a guide device **Category D** | **USP 7,842,028** Issued 11-30-2010 **M-fee due by 05-30-2018** |
| CE-1003C1 | Guide Device | 12/154,822 5-27-08 | 2009/0023995 01-22-2009 | | **USP 8,926,597 Issued 01-06-2015 M-fee due by 07-06-2018** |
| CE-1003C2 | Guide Device | 12/154,704 5-27-08 | 2008/0269727 10-30-2008 | | Abandoned |
| CE-1003U WO | Guide Device | PCT/US06/26784 7-10-06 | | | Applications filed in AU, CA, CN, EP, JP, KR |
| CE-1003AU Australia | Surgical Instrument | 2006276773 7-10-06 | | | **Abandoned** |
| CE-1003CA Canada | Surgical Instrument | 2,615,782 | | | **Abandoned** |
| CE-1003CN China | Surgical Instrument | 2006-80030320.5 | | | Patented ZL 200680030320.5 **Abandoned** |
| CE-1003EP Europe | Surgical Instrument | 06786815.8 | | | **Abandoned** |
| CE-1003HK | Surgical Instrument | 09111709.0 12-14-09 | | | **Abandoned** |
| CE-1003JP Japan | Surgical Instrument | 2008-522815 | | | Patent No. 5139979 Issued 11-22-2012 Annuity due **11-22-2015** |
| CE-1003KR Korea | Surgical Instrument | 2008-7001525 | | | **Abandoned** |
| CE-1004U | Surgical Instrument | 11/302,654 12-14-05 | | More details on the tip rotation feature **Category A** | **USP 7,338,513** Issued 03-04-08 **M-fee due by 09-04-2015** |

| File Number | Title | Patent Office Info | Publication No. | Description of Property | Status Due Dates |
|---|---|---|---|---|---|
| CE-1004C1 | Surgical Instrument | 12/074,378 03-03-08 | 2008/0262537 10-23-2008 | | **USP 8,221,450** Issued 07-17-2012 **M-fee due by 01-17-2016** |
| CE-1004PCT | Surgical Instrument | PCT/US06/ 013398 4-11-06 | | More details of instrument | Application Converted KR |
| CE-1004KR Korea | Surgical Instrument | 2007-7026515 | | | **KR Patent No. 1098199 Abandoned** |
| CE-1005P | Surgical Instrument | 60/802,885 5-23-06 | | Lock Mechanism Spherical Discs | Converted to Utility 08-16-2006 |

| CE-1005U | Surgical Instrument | 11/505,003 08-16-2006 | 2007/0276430 11-29-2007 | Locking Mechanism Spherical Discs **Category B** | **USP 8,105,350** Issued 01-31-2012 **M-fee due by 07-31-2019** |
| CE-1005 Con | Surgical Instrument | 13/307,352 11-30-11 | 2012/0253324 10-04-2012 | | **Abandoned** |
| CE-1005U WO | Surgical Instrument | PCT/US07/ 11996 05-21-07 | | | Applications filed in EP and JP |
| CE-1005EP | Surgical Instrument | 07795071.5 | | | **Abandoned** |
| CE-1005JP | Surgical Instrument | 2009-512066 | | | Patent No. 5090441 Issued 09-21-2012 Annuity due **09-21-2015** |
| CE-1006P | Surgical Instrument | 60/811,046 6-5-06 | | Lock Mechanism Ball and Rider | Converted to Utility 09-19-2006. |
| CE-1006U | Surgical Instrument | 11/523,103 9-19-06 | 2007/0282371 12-06-2007 | Lock Mechanism Ball and Rider **Category B** | **USP 7,615,067** Issued 11-10-2009 **M-fee due by 05-10-2017** |
| CE-1006Div. | Surgical Instrument | 12/587,996 10-15-09 | 2010/0106183 04-29-2010 | | **Abandoned** |
| CE-1006U WO | Surgical Instrument | PCT/US07/ 12737 5-30-07 | | | Applications filed in EP and JP |
| CE-1006EP | Surgical Instrument | 07795488.1 | | | **Abandoned** |
| CE-1006JP | Surgical Instrument | 2009-514311 | 5072959 11-14-2012 | | Patent No. 5072959 Issued 08-31-2012 Annuity due **08-31-2015** |

3

| File Number | Title | Patent Office Info | Publication No. | Description of Property | Status Due Dates |
|---|---|---|---|---|---|
| CE-1007P | Surgical Instrument | 60/838,059 8-16-06 | | Lock Mechanism With Trigger | Converted to Utility 11-28-06 |
| CE-1007U | Surgical Instrument | 11/605,694 11-28-06 | 2008/0046000 02-21-2008 | Lock Mechanism with Trigger **Category B** | **USP 7,708,758 Issued 05-04-2010** M-fee due by **11-04-2017** |
| CE-1007Con | Surgical Instrument | 12/798,552 04/06/2010 | 2010/0228235 09-09-2010 | | **USP 8,709,037** Issued 04-29-2014 **M-fee due by 10-29-2017** |
| CE-1007U WO | Surgical Instrument | PCT/US07/16630 7-24-07 | | | Applications filed in EP, JP, KR, CN |
| CE-1007CN | Surgical Instrument | 2007800301 61.3 | | | Issued ZL200780030161. **Abandoned** |
| CE-1007EP | Surgical Instrument | 07836217.5 | | | **Abandoned** |
| CE-1007HK | Surgical Instrument | 10100094.3 | | | **Abandoned** |
| CE-1007JP | Surgical Instrument | 2009-524600 | | | Patent No. 4989724 Issued 05-11-2012 **Abandoned** |
| CE-1007KR | Surgical Instrument | 2009-7003162 | | | **Abandoned** |
| CE-1008P | Surgical Instrument | 60/830,035 07-11-06 | | Instrument with Trigger Lever | Converted to Utility 9-27-06. |
| CE-1008U | Surgical Instrument | 11/528,134 9-27-06 | 2008/0015631 01-17-2008 | Instrument with Trigger Lever **Category B** | **USP 8,029,531 Issued 10-04-2011 2nd M-fee due by 04-04-2019** |
| CE-1008 Con | Surgical Instrument | 13/108,044 05-16-2011 | 2011/0213347 09-01-2011 | | **Abandoned** |
| CE-1008U WO | Surgical Instrument | PCT/US07/14868 06-27-07 | | | Application filed in EP |
| CE-1008 EP | Surgical Instrument | 07796486.4 | | | **Abandoned** |
| CE-1009P | Surgical Instrument | 60/844,130 09-13-06 | | | Converted to Utility 01-02-07 |
| CE-1009U | Surgical Instrument | 11/649,352 01-02-07 | 2008/0065116 03-13-2008 | Instrument for Release **Category C** | **USP 7,648,519** Issued 01-19-10 M-fee due by **07-19-2017** |
| CE-1009Con | Surgical | 12/592,767 | 2010/0168722 | | **USP 8,083,765** |

| File Number | Title | Patent Office Info | Publication No. | Description of Property | Status Due Dates |
|---|---|---|---|---|---|
| | Instrument | 12-02-09 | 07-01-2010 | | Issued 12-27-2011 M-fee due by **06-27-2019** |
| CE-1009 Con2 | Surgical Instrument | 13/307,321 11-30-11 | 2012/0245567 09-27-2012 | | **Abandoned** |
| CE-1009U WO | Surgical Instrument | PCT/US07/ 19307 09-05-07 | | | Applications filed in AU, CA, CN, EP, IN, JP and KR |
| CE-1009AU | Surgical Instrument | 2007294995 | | | **Abandoned** |
| CE-1009CA | Surgical Instrument | 2,663,305 | | | **Abandoned** |
| CE-1009CN | Surgical Instrument | 2007800340 76.4 | | | **Abandoned** |
| CE-1009EP | Surgical Instrument | 07837706.6 | | | **Abandoned** |
| CE-1009IN | Surgical Instrument | 1672/DELN P/2009 | | | **Abandoned** |
| CE-1009HK | Surgical Instrument | 10101163.7 02-07-2012 | | | **Abandoned** |
| CE-1009JP | Surgical Instrument | 2009-528236 | | | Patent No. 5089699 Issued 09-21-2012 Annuity due **09-21-2015** |
| CE-1009KR | Surgical Instrument | 2009-7007555 04-13-2009 | | | **Patent No. 1149490 Abandoned** |
| CE-1010U | Surgical Instrument | 11/786,167 04-10-07 | 2008/0255420 10-16-2008 | Miscellaneous features including sliding sleeve and distal ball/socket **Category D** | Pending Response filed 10/11/2011 |
| CE-1010U WO | Surgical Instrument | PCT/US08/ 03920 03-26-08 | | | **No National Phase Filings** |
| CE-1011U | Surgical Instrument | 11/805,420 05-22-07 | 2008/0294191 11-27-2008 | Additional locking features **Category D** Clutch Concepts | **USP 8,409,245** Issued 04-02-2013 M-fee due by **10-02-2016** |
| CE-1011U WO | Surgical Instrument | PCT/US08/ 06022 05-12-08 | | | Filed CN, EP, JP |
| CE-1011CN | Surgical Instrument | 2008800187 16.7 | | | **Abandoned** |
| CE-1011EP | Surgical Instrument | 08754349.2 | | | **Abandoned** |
| CE-1011HK | Surgical | 10107884.2 | | | **Abandoned** |

| File Number | Title | Patent Office Info | Publication No. | Description of Property | Status Due Dates |
|---|---|---|---|---|---|
| | Instrument | | | | |
| CE-1011JP | Surgical Instrument | 2010-509338 | | | **Abandoned** |
| CE-1012U | Surgical Instrument | 11/900,417 09-11-07 | 2009/0069842 03-12-2009 | Re-posable **Category D** Front Load | **USP 8,257,386** Issued 09-04-2012 M-fee due by **03-04-2016** |
| CE-1012 Div. | Surgical Instrument | 13/570,317 08-09-12 | 2012/0303006 11-29-2012 | | **Abandoned** |
| CE-1012AU | Surgical Instrument | 2008297469 | | | **Abandoned** |
| CE-1012CA | Surgical Instrument | 2,697,746 | | | **Abandoned** |
| CE-1012CN | Surgical Instrument | 2008801064 69.6 | | | Pending Response filed 11-2012 |
| CE-1012EP | Surgical Instrument | 08795623.1 | | | **Abandoned** |
| CE-1012HK | Surgical Instrument | 10112044.9 | | | **Abandoned** |
| CE-1012IN | Surgical Instrument | 1605/DELN P/2010 | | | **Abandoned** |
| CE-1012JP | Surgical Instrument | 2010-524837 | | | **Abandoned** |
| CE-1012KR | Surgical Instrument | 2010-7005320 | | | **Abandoned** |
| CE-1012U WO | Surgical Instrument | PCT/US08/0 10142 08-27-08 | | | Filed EP, JP, IN, KR, CN, AU and CA |
| CE-1013U | Surgical Instrument | 12/006,278 12-31-07 | 2009/0171147 07-02-2009 | Re-posable **Category D** Front Load | **Abandoned** |
| CE-1013U WO | Surgical Instrument | PCT/US08/ 13801 12-17-08 | | | Applications filed in AU, CA, CN, EP, IN, JP and KR |
| CE-1013AU | Surgical Instrument | 2008347174 | | | **Abandoned** |
| CE-1013CA | Surgical Instrument | 2,710,251 12-17-08 | | | **Abandoned** |
| CE-1013CN | Surgical Instrument | 2008801236. 8 | | | **Abandoned** |
| CE-1013EP | Surgical Instrument | 08870045.5 | | | **Abandoned** |
| CE-1013HK | Surgical Instrument | 1110466.4 | 1150525A 01/06/2012 | | **Abandoned** |
| CE-1013IN | Surgical | 4654/DELN | | | **Abandoned** |

| File Number | Title | Patent Office Info | Publication No. | Description of Property | Status Due Dates |
|---|---|---|---|---|---|
| | Instrument | P/2010 | | | |
| CE-1013JP | Surgical Instrument | 2010-541424 | | | **Abandoned** |
| CE-1013KR | Surgical Instrument | 2010-7014322 06-28-2010 | | | **Abandoned** |
| CE-1014D | Design for a Medical Instrument | 29/301,351 2-25-08 | | | **D583,051 12-16-2008** |
| CE-1015U | Surgical Instrument | 12/387,716 05-06-09 | 2010/0286480 11-11-2010 | **Category D** Alternate Bending (wires, cables, rods) | **Abandoned** |
| CE-1015WO | Surgical Instrument | PCT/US10/ 01302 05/03/2010 | WO2010/ 129034 11-11-2010 | | No foreign filing |
| CE-1016U | Surgical Instrument Guide Device | 12/387,717 05-06-09 | 2009/0299344 12-03-09 | **Category D** Flexible Guide | **USP 8,409,175** Issued 04-02-2013 M-fee due by **10-02-2016** |
| CE-1016WO | Surgical Instrument | PCT/US10/ 01304 05/03/2010 | WO2010/ 129035 11-11-2010 | | Filed in CN, EP and JP |
| CE-1016CN | Surgical Instrument Guide Device | 2010800250 71.7 12-06-2011 | | | Pending Not yet examined |
| CE-1016EP | Surgical Instrument Guide Device | 10772371.0 05-03-2010 | | | **Abandoned** |
| CE-1016JP | Surgical Instrument Guide Device | 2012-509787 | | | **Abandoned** |
| CE-1017P | Surgical Instrument | 61/211,410 03-30-09 | | | Converted to utility |
| CE-1017U | Surgical Instrument | 12/584,988 09-15-09 | 2010/0249497 09-30-2010 | **Category D** Curved Shaft and Rotation | **Abandoned** |
| CE-1017WO | Surgical Instrument | PCT/US10/0 0878 03-23-2010 | WO2010/ 117411 10-14-2010 | | Applications filed in EP and KR |
| CE-1017EP | Surgical Instrument | 10761955.3 03-23-2010 | | | **Abandoned** |

7

| File Number | Title | Patent Office Info | Publication No. | Description of Property | Status Due Dates |
|---|---|---|---|---|---|
| CE-1017KR | Surgical Instrument | 2011-7022750 09-28-2011 | | | **Abandoned** |
| CE-1018U | Surgical Instrument | 12/590,452 11-06-09 | 2011/0112517 05-12-2011 | **Category D** Reposable Rear Mount | **Abandoned** |
| CE-1018-1 Con | Surgical Instrument | 13/758,272 02-04-2013 | | | **Abandoned** |
| CE-1018WO | Surgical Instrument | PCT/US10/ 53638 10-22-2010 | WO2011/ 056458 05-12-2011 | | No National Phase filings |
| CE-1019U | Surgical Instrument | 12/661,765 03/23/2010 | 2011/0238108 09-29-2011 | **Category C** Resilient Locking | **Abandoned** |
| CE-1019WO | Surgical Instrument | PCT/US11/2 8779 03-17-2011 | WO 2011/ 119399 09-29-2011 | File CN? Getting estimate. | Application filed in CN |
| CE-1019CN | Surgical Instrument | | | | **Abandoned** |
| CE-1020D | Medical Instrument | 29/348,936 02-23-2010 | | | **D631,155 Issued 01-18-2011** |
| CE-1020D Div. | Medical Instrument | 29/380,600 12-08-2010 | | | **D640,789 Issued 06-28-2011** |
| CE-1021P | Medical Device | 61/439,965 02-07-2011 | | | Converted to Utility No Foreign |
| CE-1021U | Medical Device | 13/367,560 02-07-2012 | | **Category D** | **Abandoned** |
| CE-1022P | Single Incision Port Device | 61/383,384 09-16-2010 | | | Converted to utility |
| CE-1022U | Single Incision Port Device | 13/232,112 09/14/2011 | | **Category D** Single Port Concepts | **Abandoned** |
| CE-1023P | End Effector Constructi on | 61/466,999 03-24-2011 | | | Converted to Utility – see CE-1024U |
| CE-1024P | End Effector Constructi on | 61/482,397 05-04-2011 | | | Converted to Utility CE-1024U |
| CE-1024U | End Effector Constructi on | 13/423,434 03-19-2012 | | (combined CE-1023P and CE-1024P) **Category D** End Effector Construction | Allowed Issue Fee Due **10-14-2015** |

| File Number | Title | Patent Office Info | Publication No. | Description of Property | Status Due Dates |
|---|---|---|---|---|---|
| CE-1025P | Medical Device | 61/565,127 11-30-2011 | | (relates to CE-1021P) | Utility filed combined with CE-1021 on 02-07-12 |
| CE-1026P | Reposable articulating Laparo-scopic Device | 61/475,258 04-14-2011 | | | Converted to Utility 04-16-2012 No FF |
| CE-1026U | Reposable articulating Laparo-scopic Device | 13/447,424 04-16-2012 | | **Category D** | **Abandoned** |
| CE-1027P | Tack Driver | 61/485,492 05-12-2011 | | Tack Driver | Utility filed 05-14-2012 |
| CE-1027U | Tack Driving Instrument | 13/470,401 05-14-2012 | | **Category D** | **Abandoned** |
| CE-1028P | Reposable Instrument w/Rotating Ring | | | | Disclosure state |
| CE-1029P | Motorized Articulating Camera | | | | Disclosure state |
| CE-2001 | Forman Opinion | | | OPINION | Finished |
| CE-2002 | TNCO Opinion | | | OPINION | Finished |
| CE-2003 | Novare IP | | | STUDY | |
| CE-3001 | Prior Art Collection | | | KNOWN PRIOR ART | |
| CE-4001 | Misc. | | | Misc., meetings, etc. | |
| TM CE-5001 | TM Misc. | | | Searches done for Attain; lapro-angle and autonomy | |
| TM CE-5101 | PURE WRIST | 78/634,914 5-23-05 | | Goods: Surgical and therapeutic devices for minimally invasive surgery and therapy. | Reg. No. 3,403,050 Registered 3-25-08 **Abandoned** |
| TM CE-5102 | CAMBRIDGE ENDO | 78/634,913 5-23-05 | | Goods: Surgical and therapeutic devices for minimally invasive surgery and therapy. | Reg. No. 3,412,812 Registered 4-15-08 **Renewal Due 04-15-2018** |
| TM CE-5103 | Autonomy | 76/671,328 | | Goods: Surgical and | Reg. No. 3,407,722 |

9

| File Number | Title | Patent Office Info | Publication No. | Description of Property | Status Due Dates |
|---|---|---|---|---|---|
| | | 01-12-07 | | therapeutic devices for minimally invasive surgery and therapy. | Registered 4-8-08 **Renewal Due 04-08-2018** |
| TM CE-5104 | LAPARO-ANGLE | 76/671,329 01-12-07 | | Goods: Surgical and therapeutic devices for minimally invasive surgery and therapy. | Reg. No. 3,407,723 Registered 4-8-08 **Abandoned** |

10